Argued March 26; reargued June 3; affirmed July 7; rehearing
denied October 6, 1936

IN RE JENNINGS ET AL.

## JENNINGS ET AL. *v.* STATE

(59 P. (2d) 702)

*Tom Garland*, of Portland, for appellants.

*James R. Bain*, District Attorney, and *T. B. Hand-ley, Joe Price*, and *A. M. Hodler*, Deputy District Attorneys, all of Portland, for the State.

ROSSMAN, J.  An indictment, dated November 28, 1934, returned by the grand jury of Multnomah county against one Art Shearer and 33 others charged the indictees with the crime of rioting. The four appellants are not in the group just mentioned. The indictment alleges that the 34 defendants on August 20, 1934, tumultuously assembled, armed themselves with missiles and clubs and then hurled these objects in the direction of an individual named James Conner. Art

Shearer, upon his motion, was granted a separate trial. The State contended that the alleged riot occurred in front of a structure, 72 by 94 feet in size, located at the northeast corner of Fourteenth and Alberta streets, Portland, which was then used as a hiring hall by an organization of longshoremen known as the Columbia Rivermen's Association. Conner was in this structure at the time of the alleged riot. During the course of Shearer's trial the four appellants, Paul Jennings, C. M. Abbott, Arthur Rust and Karl Tigert, were called by the State to give testimony. Each of the four, in response to questions propounded by the district attorney, stated his name, his address, the fact that he followed the occupation of longshoreman and that he was acquainted with the aforementioned structure. After Abbott had given this information, he was asked: "Were you present inside the hall at Fourteenth and Alberta on the morning of August 20, 1934, between the hours of 7:00 o'clock in the morning and 9:30 o'clock in the morning?" He replied, "I refuse to answer that because it might incriminate me". Jennings was asked: "Now, during August, we will say the 20th of August last year, were you present out at the hall at Fourteenth and Alberta the morning—that is, the morning of August 20th at approximately 7:30 and 9:00 o'clock?" His reply was: "Well, Mr. Price, I refuse to answer any question that will incriminate me." Rust was asked: "Now, will you state if on August 20th, and if you do not recognize or recall that date I will state it is the date of the rioting at Alberta and Fourteenth, and did you state that you were present and inside the hall at any time between the hours of 7:00 o'clock in the morning and 9:30 in the morning on August 20, 1934?" He replied: "I refuse to answer the question as the answer might incriminate me."

Tigert was asked: "Were you in the hall on the morning of August 20th between 7:00 o'clock in the morning and 9:30 in the morning?" and replied: "I refuse to answer that, Your Honor, because the answer will incriminate me." After being advised by the presiding judge that the question called for no incriminating information, the witness added: "It may be satisfactory to you, Your Honor, but I do know that I am implicated in this—and I do know that I may incriminate myself if I answer."

Before adjudging the appellants guilty of contempt, the trial judge reviewed the testimony which we shall now mention, heard extensive arguments from counsel, and then informed each appellant that the questions called for no incriminating answers.

The record, which consists of the brief testimony given by these four witnesses in the circuit court reviewed above, and the extensive colloquy between court and counsel, is accompanied by 1,864 pages of testimony taken in the municipal court of Portland at the time the other 34 defendants, together with other persons arrested with them, were afforded a preliminary hearing. By stipulation of counsel, the transcript of the testimony taken in the municipal court was made a part of the record in the contempt proceedings.

Briefly stated, the record indicates that in the summer of 1934 the longshoremen employed upon the Portland waterfront were engaged in a strike which terminated July 28, 1934. After the strike was well under way an organization known as the Columbia Rivermen's Association was organized with a membership of about 70 men who then became engaged in the occupation of longshoremen. Appellants' counsel refers to this organization as a company union. Abbott was a member of this association and Jennings was

not. Whether the other two appellants did or did not belong to the organization is not disclosed by the record. In the early part of August, 1934, the Columbia Rivermen's Association obtained the use of a structure at Fourteenth and Alberta streets which they thereupon used as a hiring hall. It had been previously used as a garage and was equipped with large doors on both the Alberta and the Fourteenth street sides. The Alberta street door, however, could not be opened. In the corner space at Fourteenth and Alberta streets was an office with plate glass windows on its two street sides.

About 6:30 a. m., August 20th, some of the members of the Columbia Rivermen's Association and a few other longshoremen who obtained employment at that place began to assemble in the above-named hall. About 70 men were present including the appellants. An order was soon received from the Luckenbach dock for four gangs of longshoremen and the crews were organized. However, before the men left the hall a message was received stating that the Luckenbach dock was being picketed and ordering the men to remain in the hall. Thereupon the men loitered until the events transpired which we shall now describe. About 8:30 a. m. those in the hall saw men alighting from automobiles near their hall and saw some of the arrivals go to vacant lots where they picked up rocks, chunks of concrete, pieces of wood, etc. The Columbia Rivermen, being apprehensive of danger, hurriedly brought their automobiles into the hall, went in themselves, shut the Fourteenth street door and then locked it. It will be recalled that the Alberta street door was already securely fastened. A telephone message was then sent for police assistance. In the meantime, the number outside increased until there were approximately 100

men in front of the hall. Up to the time the Columbia Rivermen had withdrawn into their hall no trouble had occurred. If a word, a threat or a blow was exchanged between the two groups none of the numerous witnesses mentioned the incident. Apparently the Columbia Rivermen were busily engaged in getting their cars into the hall and locking the doors. The other group was occupied with the parking of its cars and assembling. But after the doors of the hall had been closed trouble developed. The men on the outside first broke the office windows. Then they hammered on the Fourteenth street doors, breaking the windows on that side, and, finally, transferred the attack to the Alberta street side of the hall. In the meantime, clubs, rocks, chunks of concrete, etc., were hurled into the structure. At least two men in the hall were struck by the missiles. One of them was James Conner, the individual named in the indictment. The disturbance lasted for about 10 minutes, and then those on the outside hastily withdrew. Immediately prior to their hurried departure a shot was heard and James Conner, who had previously been knocked down by a rock, screamed and slumped to the floor. He died a moment later. There is no evidence that Conner had spoken a word to anyone on the outside of the structure or that he had sought to molest anyone.

There is no evidence whatever that anyone on the inside hurled back to those on the outside any of the missiles which were entering the hall. There is no evidence that anyone on the inside spoke to the attackers in profane or any other language. There is evidence, however, wholly uncontradicted, that the older men on the inside cautioned the young men not to throw back any missiles, to remain quiet and to refrain from provocative conduct. The evidence indi-

cates that those who were in the office at the time the attack began hastily vacated that room because they were easy targets for the rocks that crashed through the windows. Next, when the attack was transferred to the long Fourteenth street side of the building, the men inside sought refuge near the Alberta street side, being protected there somewhat by one side of the office wall which for its length paralleled the Fourteenth street side of the building. Finally, when the attack was centered on the Alberta street side those on the inside found refuge in the lavatory, in the spaces between the autos, under a machinists' bench which still remained in the hall, and in other available places.

One of the witnesses, a Mrs. Murray, whose home faced the hall across Alberta street, swore that she saw one of the attackers reach into his pocket, take out a gun, thrust his arm through a broken window and then discharge the gun. She heard one shot and testified that the crowd dispersed immediately after the shot was fired. H. G. Petro, who was inside the hall at the time of the trouble, swore that he saw a hand holding a gun thrust itself through a broken window on the Alberta street side of the building and then saw the gun fired followed immediately by a scream from Conner. A Mrs. Gregg, who lived near the hall and who was attracted to it by the disturbance, swore that she heard three shots and smelled powder. Sixteen of the 18 men inside the hall who testified swore that they heard shots. Two believed that they heard only one shot. The rest estimated the number from two to six or seven. Apart from Petro, W. V. Bethards and M. V. Butler, none of those on the inside saw a gun in the hall or heard a shot fired therein. Bethards, who described himself as ''a banker'', found himself out of employment in May of 1929 and after several

unsuccessful efforts to establish himself in employment drifted north into Oregon in the early part of 1934. For a few days he worked in a hayfield and then took employment during the course of the strike as a longshoreman. He arrived at the hall August 20th at 6:30 a. m. When the missiles began to enter the hall he found refuge between two automobiles near the Alberta street side of the structure. According to him, Conner, after being knocked down by the rock, joined Bethards in the space between the two cars. Shortly afterward Bethards heard two shots and looking up saw a man alongside of an adjacent automobile holding a gun. Bethards was not familiar with the identity of this individual, but said that the gun was pointed toward the Alberta street doors of the hall, that being the place where the attack was then centering. In a moment or two Bethards turned in the opposite direction and saw a man only eight feet away whom he recognized as Karl Grammer, pointing a gun over the hood of a car in such a manner that the bullet when discharged "would go over the heads of anyone outside the Alberta street wall". At that moment the gun was fired and Grammer at once "turned very pale". Just before Grammer had fired, according to Bethards, Conner "had stepped around in front of me toward Grammer". Immediately after the shot was fired Conner groaned, grabbed Bethard's hand and sank to the floor. This testimony, if it is true, warrants a belief that Grammer accidentally shot Conner while trying to shoot over the heads of those outside. Grammer was held to the grand jury which returned a not true bill. The other one of these two witnesses, Butler, had served during two weeks of the strike as a special police officer and at the conclusion of that employment visited the Columbia Rivermen's hall to obtain work as

a longshoreman. He was in the hall on the morning of August 20th. He swore that he saw a man, whom he was wholly unable to describe, about 64 feet away, near the rear wall of the building and approximately half-way north of the Alberta street side, point a gun over the top of a car. He then saw a flash, but did not hear a shot, accounting for that fact by stating that the noise of the breaking glass drowned out all other sounds. He heard Conner scream, but said that the scream and the flash were not simultaneous. He could not say how much time elapsed between the flash and the scream, but swore "there was a space of time" between the two. The record indicates that the identity of the individual who shot Conner has not been determined.

Several witnesses testified that after the encounter they saw many rocks, chunks of concrete, etc., on the floor of the hall. A bullet was found near Conner's body. Two or three of the witnesses saw on the walls of the hall what they believed were bullet marks. A small boy found a cartridge on the outside of the hall. No one testified that he saw any missiles thrown out of the hall.

The above description of the events that transpired at the hall is taken from the testimony of the above-mentioned 20 witnesses which includes the testimony of two of our present appellants, Abbott and Jennings. There is virtually no conflict in the testimony except, as already indicated the witnesses' estimates of the number of shots vary, and most of those inside the structure disagreed with Bethards and Butler by swearing that no shots were fired from within. Two or three testified that they were unable to state whether the shots they heard came from within or from without.

At the conclusion of the hearing in the municipal court all of the 34 men against whom indictments charging riot were subsequently returned were bound over to the grand jury. The indictment indicates that all four of these appellants testified before that body. The record indicates that all four of these appellants shortly after the alleged riot signed and delivered statements to the district attorney wherein they described what they had seen and heard. And, as we have stated, two of them testified in the municipal court during the course of the extensive preliminary hearing. The examination of these two, Abbott and Jennings, like the examination of all of the witnesses, was very long and was recorded by a court reporter. Abbott's testimony covers 117 typewritten pages and Jennings' 51 pages. Both witnesses answered "yes" to an inquiry as to whether they were in the hall on the morning of August 20, 1934. These answers, like the others which they made, were unaccompanied by any objection that self-criminating testimony was being sought. Abbott gave a particularly detailed description of the events. He stated that when the encounter was transpiring he "was pretty sure my memory would fail me so I wrote a list down of those I saw", referring to the attackers. He then produced his list and read the names of those whom he saw hurling rocks and breaking windows. His testimony, like that of all the other witnesses, indicates that the men on the inside were the victims of an assault. He swore that a rock thrown by one O'Connell came through a window and so near to him (Abbott) that it "pretty near hit me". He thought that he heard five shots and that all of them were fired from the outside. He swore that he heard none fire from within. Upon cross-examination he was handed a plat showing the interior of the

structure and its immediate surroundings upon which he made 58 marks and drawings in further elaboration of his testimony. Jennings apparently made no notes during the encounter but he also gave a detailed description of the alleged riot. He, too, was given a plat upon which he then made marks. He was in the office at the outset but quickly retreated to what he described as "safer quarters". He gave the names of various of the attackers and described the part which each one of them played. He heard two or three shots that seemed to come from the outside on Fourteenth street followed shortly by three or four shots from Alberta street. He heard none from the inside. Immediately following the last fusillade he heard Conner, 10 feet away, scream. Only two minutes previously he had seen Conner knocked down by a rock, "about as big as your fist". He swore that he saw no guns on the inside.

Apart from the testimony concerning the shots fired from within the hall, which we shall analyze later, we find nothing in the record which indicates that those in the hall, especially these four appellants, were doing any wrong or were committing any crime. Apparently the principal concern of the men in the hall was to be as unobtrusive as possible, refrain from provocative conduct and, above all things else, find shelter. It is true that four or five guns were in the hall, and we note from the record that the appellant Tigert delivered a gun to the officers. But the record does not indicate whether this gun was in the hall at the time of the firing or whether it was delivered to the officers later when they were making an intensive search for Conner's slayer. Abbott, Jennings and Rust had no guns. There is no testimony that any of the four appellants displayed a gun during the trouble

or were near the individuals described by Bethards and Butler. It will be observed from the testimony of Bethards and Butler that the shots which they described were fired after the affray was well under way. In other words, these shots did not start the trouble. Bethards' testimony, and possibly Butler's also, indicates that the shots were fired high, and it may be reasoned therefrom that they were intended to scare or warn those on the outside. Without reviewing the testimony further, we state our belief that there is nothing in the record which indicates that the four appellants were committing any crimes during the course of the encounter or were guilty of any wrongful conduct whatsoever.

In addition to the above, the transcript of testimony taken in the municipal court contains the testimony of eight police officers who came to the hall immediately after the attackers had left, or who conducted the investigation into the death of Conner. It also contains the testimony of some men employed upon the Luckenbach dock and the testimony of an individual who prepared the numerous plats used by Abbott, Jennings and the other witnesses already mentioned. We have read all of this testimony, but since it has no direct bearing upon the events of August 20th we have not set forth a review of it herein.

There is no evidence whatever that the hall at Fourteenth and Alberta streets was equipped with any unlawful devices such as gambling tables, a bar, or any other device which would render it unlawful for anyone to visit the place. We have given a full description of the hall and its equipment. Some of those who made the attack were named and described by the aforementioned witnesses. Apparently the attack

was the result of ill feeling which existed between the members of the Columbia Rivermen's Association and other longshoremen.

■ The appellants state that the record before us does not tell the whole story—but the record contains everything that the parties disclosed. Abbott and Jennings, at least, told everything they knew. For instance, in the municipal court Jennings was asked by the same attorney who argued in the circuit court in behalf of his claim of privilege: "You have no disposition to withhold any information?" He replied: "No, sir." Thereupon followed many questions and answers which we have already mentioned. The testimony of these two men given in the municipal court indicates that they very willingly, in fact, eagerly, told the whole of their stories. Abbott, as already indicated, in order to assure himself of accuracy and fullness of detail, frequently referred to notes which he made at the time of the disturbance. But Rust and Tigert did not testify in the municipal court, and we have neither a record of their testimony before the grand jury nor the statements which they signed and delivered to the district attorney. The only challenge to the accuracy of the lengthy transcript of testimony is a statement made by the appellants' counsel in his brief. He refers to some evidence which, according to his statement, was developed in the trial of *State of Oregon v. Art Shearer.* But these purported facts are no part of the record before us, and, while we have confidence in the integrity of appellants' counsel, well-established rules require that we ignore these statements.

Article I, § 12, constitution of Oregon, provides:

"No person shall be  *  *  *  compelled in any criminal prosecution to testify against himself."

William Howard Taft, speaking in 1905, expressed a belief that the privilege of silence "if traced back to its original source, had reference to a system of torture which did prevail in the time of the early English kings, and which was intended to denounce, not the mere calling of a defendant to testify and inviting him by questions so to do, but the actual compulsion of evidence by physical means": 15 Yale Law Journal 1. The present form of the privilege is due largely, according to Wigmore on Evidence (2d Ed.), § 2250, to the conflict between the ecclesiastical and popular courts which raged in the sixteenth century. The privilege recognized by the fifth amendment to the federal constitution, of which the above-quoted Oregon provision is a counterpart, is thus described by Hon. John C. Knox, United States district judge:

"There is some basis for the belief that these amendments, as they are at present interpreted and applied, have come to be something of a plague upon the enforcement of law, order and public decency." 74 Penn. Law Rev. 139.

Section 9-2102, Oregon Code 1930, provides:

"A witness shall answer questions legal and pertinent to the matter in issue, though his answer may establish a claim against himself; but he need not give an answer which will have a direct tendency to subject him to punishment for a felony, or * * *"

In support of their claim of privilege, the appellants cite *United States v. Burr*, 25 Fed. Cas. 38, stating that in that decision may be found "the legal principles underlying the case at bar". Appellants argue that if the witness swears he will criminate himself by answering he can not be required to answer a question which inquires whether at the time of its commission he was in a room or other place where a homicide or

other crime occurred. In support of their contention they cite *In re Sales,* 134 Cal. App. 54 (24 P. (2d) 916) ; *In re Crow,* 126 Cal. App. 617 (14 P. (2d) 918) ; *People.v. Argo,* 237 Ill. 173 (86 N. E. 679) ; *Sovereign Camp of Woodmen of the World v. Bailey* (Tex.), 234 S. W. 412; *In re Askwith,* 31 Ont. 151. Next, as illustrative of the manner in which the privilege against self-crimination protects a witness against being required to furnish a link in the chain of evidence necessary to his conviction of a crime, the appellants cite 13 C. J., p. 28, § 34; 70 C. J., p. 726, § 877; *Overman v. State,* 194 Ind. 483 (143 N. E. 604) ; *Ex parte Irvine,* 74 Fed. 954; *Foot v. Buchanan,* 113 Fed. 156; *Ex parte Chapman,* 153 Fed. 371; *Matter of Doyle,* 257 N. Y. 244 (177 N. E. 489, 87 A. L. R. 418). Finally, they contend that legislation can not limit the privileges granted by a constitutional provision, and cite *Counselman v. Hitchcock,* 142 U. S. 547, 560 (35 L. Ed. 1010, 1113, 12 S. Ct. 195).

▇▇▇ We shall now review the above cited authorities. Since both sides agree that Chief Justice Marshall in *United States v. Burr,* supra, set forth correctly the legal principles governing the privilege against self-crimination, and since each party argues that the principles as thus outlined determine this appeal, it may be well to review briefly the facts before the court in the Burr case. That controversy had its inception when the federal attorney sent to the grand jury which was considering charges of treason against Burr "a certain letter in cipher addressed to Dr. Bollman under a fictitious name and alleged to be in the handwriting of Mr. Willie, Burr's secretary". Willie was called to prove the authenticity of the letter, the federal attorney claiming that he was able to give the necessary testimony because he either copied the document at Burr's

direction or had acquired the needed knowledge through other means. After several questions had been submitted to the witness and withdrawn because Willie invoked the privilege against self-crimination, the federal attorney stated: ''I will simply ask him whether he knows this letter to be written by Aaron Burr or by someone under his authority.'' The witness declined to answer. His counsel pointed out, ''The knowledge of the treason and concealment of it amount to a misprision of treason. * * * If a man know of treasonable matter and do not disclose it, he is guilty of misprision of treason. * * * The witness is to judge for himself though the question may not seem to affect him''. He further argued that though a preliminary question ''may be an innocent one, yet the council for the prosecution might go on gradually from one question to another, until he at last obtained matter enough to criminate him''. The claim of privilege was denied. Chief Justice Marshall pointed out that the question did not require the witness to disclose whether at the time the letter was written Willie had knowledge of it, but that ''It refers only to the present knowledge of the cipher. * * * The question may be answered without implicating the witness because his present knowledge would not, it is believed, in a criminal prosecution justify the inference that his knowledge was acquired previous to this trial''. In so holding, the chief justice phrased the legal principles which are now accepted virtually everywhere. They are: (1) Generally ''every person is compellable to bear testimony in a court of justice;'' (2) an exception to this rule has created ''a settled maxim of law that no man is bound to criminate himself;'' (3) it is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against

the witness;" (4) if a direct answer to the question will not criminate the witness, he must answer; (5) but "if the question be of such a description that an answer to it may or may not criminate the witness according to the purport of that answer, it must rest with himself who alone can tell what it would be to answer the question or not;" (6) the privilege includes "a fact that would form a necessary and essential part of a crime". All of the above elements of the rule, except the fourth, are stated in language which we have taken from the Burr decision. As justification for the fourth subdivision, we depend not only upon the result in the Burr case but also upon the following language of the decision:

"These cases [the authorities submitted by the witness' counsel] do not appear to the court to support the principle laid down by the counsel for the witness in the full latitude in which they have stated it.  *  *  * There may be questions no direct answer to which could, in any degree, affect him; and there is no case which goes so far as to say that he is not bound to answer such questions.  *  *  *  When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness."

We, therefore, interpret the Burr decision as holding that the witness' oath that an answer will criminate him is not final. Our interpretation is supported by *Mason v. United States,* 244 U. S. 362 (61 L. Ed. 1198, 37 S. Ct. 621); Wigmore on Evidence (2d Ed.), § 2271; 29 Mich. Law Rev. 191 (at 198); 19 Minn. Law Rev. 426 (at 432); and many other authorities.

In *In re Sales,* supra, the two petitioners had been convicted of a contempt of court in declining to answer a series of questions propounded to them by the district attorney who was prosecuting a group of Fili-

pinos for the murder of a young married woman named Cecelia Novarro. The entire group, with the exception of one of the petitioners, belonged to a lodge composed of Filipinos. At a meeting of the lodge Mrs. Novarro was tried for alleged matrimonial misconduct, was convicted, and, after being driven in an automobile to an isolated spot, was there buried alive. One of the petitioners had testified before the grand jury that she attended the lodge meeting, that Mrs. Novarro was tried there; that she rode in an automobile with Mrs. Novarro to the open grave, saw Mrs. Novarro blindfolded, saw her thrust into the grave and buried. The other petitioner had testified that he was not present at the lodge meeting, but that he drove his wife to the meeting and that he drove a group to the vicinity of the grave, being familiar with the fact that they intended to put Mrs. Novarro "down in a hole". Upon the murder trial the prosecution sought to elicit from these two persons the foregoing facts, but they refused to testify, stating that their answers would criminate them. In reversing their conviction, the district court of appeals said:

"Manifestly the admission or confession on their part that they were among those who took the unfortunate Mrs. Novarro out to the place where it is claimed she was murdered, that they knew at the time she was removed from the automobile that she was to be done away with, and that one of the petitioners was present when Mrs. Novarro was shoved into the excavation and covered with earth, could be urged against them afterwards as strong circumstances tending to establish that they, too, were principals in the commission of the crime."

It will be observed that the testimony which was there sought from the witnesses would have proven, not that they were the victims of the crime, but that

they were participants in the murder of Mrs. Novarro.

In *In re Crow,* supra, the petitioner had been convicted of a contempt in declining to answer two questions propounded to her by the district attorney in the trial of one Dr. G. E. Grosse for using instruments upon the petitioner with the intent of procuring a miscarriage. The questions inquired for the date when the visit was made to the office of the accused and for the name of the person who accompanied her. In holding that the witness was entitled to the benefit of the privilege, the court (District Court of Appeal), after pointing out that California statutes render it a felony for a woman to subject herself to such an operation, declared:

"It is quite possible that the prosecution had sufficient evidence without the testimony of petitioner and her husband to establish all the necessary facts except the identity of the party upon whom the operation was performed, and that the identity could not be established without their testimony."

Here, again, the witness was a participant in the crime.

In *People v. Argo,* supra, the petitioner had been adjudged guilty of a contempt for refusing to answer approximately a score of questions concerning gambling and bribery propounded to him by a county grand jury which was investigating some bribery charges. The witness claimed that the grand jury sought information violative of his privilege against self-crimination. The lower court, pursuant to an Illinois statute which authorized the grant of immunity in bribery investigations, had issued an order releasing the witness from liability to prosecution on account of any matter relating to his testimony. According to the decision of the supreme court it was conceded "that the questions propounded to plaintiff in error might

have a direct tendency to convict him of gambling and of keeping a gambling house, and also expose him to penal actions". The court, therefore, held that the witness' privilege of self-crimination was available to him unless the immunity order granted him complete protection. But it found that the immunity statute did not authorize a grant of immunity as broad as the available privilege. It granted amnesty against prosecution for bribery, but not for gambling. It reversed the judgment of conviction. For a criticism of this decision, see Wigmore on Evidence, § 2282, footnote 2.

In *In re Askwith,* supra, the petitioner had been convicted of a contempt for declining to answer whether he was in the defendant's hotel on Sunday, the 21st of May, being a time when the defendant, according to the charge filed against him, had illegally sold intoxicating liquors. The petitioner replied that he could not answer without subjecting himself to prosecution under the provisions of the Liquor License Act. In holding that he was not guilty of a contempt, the court declared:

"I am also clearly of the opinion, under the circumstances, that his objection is likely to be well founded, for by Sec. 57 of the Liquor License Act, it is an offense (with certain exceptions) to be found in a barroom during prohibited hours."

The prosecution then depended upon another section of the Liquor License Act which authorized magistrates to conduct inquiries into liquor violations and which required witnesses to answer the magistrate's question; but the court held that this statute could not deprive witnesses of their privilege against self-crimination. The conviction was reversed.

In *Sovereign Camp of Woodmen of the World v. Bailey,* supra, the policy of insurance upon which the

action was based provided that the insurer should not be liable if the insured met his death while engaged in a law violation. The insurer claimed that death had occurred in such manner, and, in order to establish its defense, called two witnesses who were under arrest charged with the murder of the insured. The questions propounded to these witnesses are not mentioned in the decision, but each declined to answer, invoking the privilege against self-crimination. Their claim of privilege was sustained by the trial judge. The decision, which is brief, held that

"* * * for obvious reasons the court did not err in its ruling not to require the witness to answer this questions. * * * The motive that causes such refusal can not always be seen on the face of the question. No human being 'can read the thought behind the brow'."

We do not believe that these decisions support appellant's contention that in all instances a witness may decline to answer whether he was at the scene of a crime at the time of its occurrence. It will be observed that in the Sales case the witnesses were asked, not merely whether they were at the scene of the crime, but also whether they participated by making the journey from the lodge room to the grave with the unfortunate woman who was cast alive into her grave. To have given the desired testimony would have shown that each of the two witnesses was, as the court pointed out, a principal in the commission of the crime. In the Crow case, too, the witness, whose claim to the privilege was sustained, was as much subject to prosecution as the physician against whom she was asked to testify. *People v. Argo* contains virtually nothing in point because it confined itself largely to a construction of the Illinois Immunity Statute. In the Askwith decision

an affirmative answer would have shown that the witness visited a place (barroom) on Sunday in violation of law, and would therefore have furnished the evidence necessary for his own conviction. In *Sovereign Camp v. Bailey,* the two witnesses were under arrest for the murder of the insured and were apparently asked to prove that the insured came to his death by their hands in a felonious manner. Therefore, their right to the privilege, as the court said, was "obvious".

We shall now review the group of authorities which the appellants cite to support their contention that an answer to the district attorney's question would have supplied a "link" in the chain of evidence necessary to their own conviction. 13 C. J., p. 28, § 34, merely declares that the constitutional right to immunity against self-crimination is available, not only to a person when he is on trial for a crime, but also to all witnesses in all sorts of proceedings. 70 C. J., p. 726, § 877, states that the privilege against self-crimination is not confined to the right to refuse to answer a question directly connected with the crime, but includes the right to refrain from establishing links and revealing sources from which evidence may be obtained.

In *Overman v. State,* supra, the appellant having been found guilty of a contempt, appealed. He and three others had been charged with committing an abortion upon a woman which resulted in death. After the trial of the four had begun the state dismissed its case against the appellant and then called him as a witness against the three others. He was asked regarding his acquaintance with the deceased and his codefendants. Further, the trial judge directed him "to tell anything he knew about the charge in the indictment". He refused to answer, claiming his privilege.

In holding that the trial court committed error in penalizing him for a contempt, the decision stated:

"If the woman, whose death is alleged to have been caused, was in the condition charged, it may be that whoever was responsible for that condition was guilty of a crime other than abortion. It might be the case that no abortion was committed, yet there might have been a conspiracy to have committed one. We can not presume to judge what his testimony would have been, neither could the trial court. * * * Without attempting to point out what crime his testimony might have shown him guilty of, as of course we can not do, it is apparent from what we have said that his testimony might have been such as to have tended to show him guilty of some crime other than abortion."

In *Ex parte Irvine,* supra, the two appellants had been convicted of a contempt of court for declining to answer questions propounded to them by the prosecution in the trial of 12 individuals who had been indicted for violating a federal statute prohibiting the interstate transportation of lottery tickets. Before the two were called to the stand evidence had shown that they were "carriers" entrusted with the task of carrying the money, bets and lottery tickets between the lottery shops and the headquarters of the concern which was located in a different state. As witnesses they were asked to state the connection which the individuals mentioned in the series of questions had with the lotteries as runners, clerks, markers, etc. Each swore that to answer would criminate himself. The circuit court, in a decision written by Judge Taft, stated that had the witnesses answered they would have admitted that they knew the character and use of the matter which they as carriers were transporting. And, further, that an admission by them of knowledge of the character of the business in which their employers

were engaged would have constituted a material link in establishing the guilt of the witnesses of conspiring to transport across state lines lottery tickets. In reversing the conviction of the two appellants, the court said:

"The second question is whether the statement of the witness that his answer to the question would criminate him was conclusive, so that the court could not compel an answer thereto. The great weight of authority, as well as a due regard for the right of the community to have the wheels of justice unclogged, as far as may be consistent with the liberty of the individual, leads us to reject the doctrine that a witness may avoid answering any question by the mere statement that the answer would criminate him, however unreasonable such statement may be. The true rule is that it is for the judge before whom the question arises to decide whether an answer to the question put may reasonably have a tendency to criminate the witness, or to furnish proof of a link in the chain of evidence necessary to convict him of a crime. It is impossible to conceive of a question which might not elicit a fact useful as a link in proving some supposable crime against a witness. The mere statement of his name or of his place of residence might identify him as a felon, but it is not enough that the answer to the question may furnish evidence out of the witness' mouth of a fact which, upon some imaginary hypothesis, would be the one link wanting in the chain of proof against him of a crime. It must appear to the court, from the character of the question, and the other facts adduced in the case, that there is some tangible and substantial probability that the answer of the witness may help to convict him of a crime."

The decision, for obvious reasons, held that there existed a substantial probability that the contemplated answer would have helped to show that the appellants were guilty of a crime.

*Ex parte Chapman,* supra, arose upon a petition for a writ of habeas corpus filed by the general manager

of the Barber Lumber Company, who had been adjudged in contempt of court for refusing to deliver to a grand jury that corporation's account books, stock books, title records and correspondence. The grand jury investigating the manner in which the Barber Company had acquired its timber lands from the United States government. Chapman was the corporate officer who had purchased the timber lands and he also had charge of its records. He contended that the production of the desired records would have a tendency to criminate himself. In holding that the order committing him for a contempt was void, and that he was entitled to be discharged from custody, the court said that since the corporate entries were made under the witness' supervision, and since he had charge of them it was reasonable to assume that he was implicated in anything recorded in the books, and that, hence, a forced production of the books was tantamount to forced self-crimination. We quote from the decision the following:

"When a question is propounded to a witness in the course of his examination in court or before a grand jury, he may be compelled to answer, unless there is reasonable ground to apprehend that his answer may furnish a link in the chain of evidence that might expose him to criminal prosecution."

In *Matter of Doyle*, supra, the facts were that, pursuant to a resolution, a joint legislative committee was conducting an investigation of some of the departments of the city of New York. It subpoenaed the appellant and asked him questions calculated to determine whether he had bribed some of the city officials. He declined to answer, invoking the privilege against self-crimination. It was contended that a section of the immunity statutes afforded him sufficient protection. In

reversing his conviction, the court pointed out that while the immunity statute granted him immunity from prosecution for bribery, it failed to grant protection in the event he was prosecuted for conspiracy to bribe. In so holding, the decision stated:

"A witness is not required to show, in order to make his privilege available, that the testimony which he declines to give is certain to subject him to prosecution, or that it will prove the whole crime, unaided by testimony from others. It is enough, to wake the privilege into life, that there is a reasonable possibility of prosecution, and that the testimony, though falling short of proving the crime in its entirety, will prove some part or feature of it, will tend to a conviction when combined with proof of other circumstances which others may supply. The privilege is not removed if there are loopholes in the tender of immunity through which a prosecutor can cut away to indictment and conviction. The immunity must be as broad as the privilege destroyed."

In *Foot v. Buchanan*, supra, the facts were that Foot had been subpoenaed before a grand jury to give testimony concerning alleged violations of a federal act against monopolies. The questions propounded to him inquired whether his mill had effected an agreement with other concerns whereby the price of cotton seed was regulated, the output of the mills restrained and definite territory allotted to each mill. The witness stated that to answer would tend to his crimination. After being penalized for a contempt, he petitioned for a writ of habeas corpus. In discharging him from custody, the circuit court pointed out that the immunity statute upon which the government depended did not grant amnesty as broad as the privilege against self-crimination and that, therefore, the witness was warranted in claiming the privilege. In so holding, the court stated:

"It is true that the witness can not avoid answering questions upon his mere statement that his answers to them will tend to criminate him. It is for the judge to decide whether his answer will reasonably have such tendency, or whether it will furnish an element or link in the chain of evidence necessary to convict him. In determining whether or not the witness is entitled to the privilege of silence, the court may look at all of the circumstances of the case, and determine whether or not there is reasonable ground to apprehend danger to the witness from his being compelled to testify. If the fact that the witness is in danger appears, great latitude should then be allowed to him in judging for himself of the effect of any particular question. A question which might appear at first a very slight and innocent one and might, by establishing a link in a chain of evidence, become the means of convicting the witness. Ex parte Irvine (C. C.) 74 Fed. 954. In the case at bar it appears that the defendant was already indicted for the offense about which he was examined, and the questions tended to connect him with the offense for which he is indicted. There can be no doubt that under such circumstances, when the questions are such as seek to connect him with the crime under investigation, the court will not require him to answer them."

Before determining whether these authorities support the appellants' contention that a question which inquires of a witness whether he was present at the scene of crime at the time of its occurrence seeks a link toward the crimination of the witness himself, and may therefore be ignored, we shall take note of a few more authorities.

In *United States v. Miller,* 2 Cranch's Circuit Court Reports 247, while the defendant was on trial for dueling, a witness was asked whether he saw the defendant shoot at the latter's antagonist, Smith. The witness claimed the privilege, stating that to answer might

"criminate himself as a participator in the same offense for which the prisoner then stood indicted". We now quote from the decision:

"The court, however (Cranch, C. J. contra), was of opinion that no direct answer to the question could furnish evidence against the witness, and that he was bound to answer it. This the witness still refused to do; and the court committed him for the contempt."

In *Ex parte Lindo,* 15 Fed. Cas. (No. 8,364), p. 556, the witness declined to answer the following question: "Did you within the last three months see Richard Lewis play at any public gaming table within the County of Alexandria?" The following objection was interposed: "that it may tend to criminate himself, by showing that he was present at a public gaming table, and may induce Lewis to prosecute him". The court held: "He must answer, inasmuch as the answer could not criminate nor tend to criminate himself."

In *Ex parte Bommarito,* 270 Mich. 455 (259 N. W. 310), it appeared that one James Hayes, while visiting in the city of Detroit, Michigan, was murdered on the night of October 3d or the morning of October 4, 1934. The two petitioners were accused of the murder and were arrested, but were later released. Shortly thereafter they were again taken into custody to be held as material witnesses against Sam Finazzo and Tony Abato who were now accused of the murder. Upon the trial of the two men just named the petitioners were asked: "Were you in Detroit on the morning of October 4th—the night of October 3d of this year?" Each declined to answer, claiming the benefit of the privilege against self-crimination. Each was adjudged guilty of a contempt and each instituted a proceeding for a writ of habeas corpus. In sustaining the conviction, the Michigan supreme court declared:

"These petitioners, however, though aided by counsel, objected too soon. Admission of their presence in Detroit on the day in question could not, or even might not, incriminate them any more than anyone else in the city on that day. Neither a 'yes' nor 'no' could do this, and there could be no other answer. To hold otherwise would be to ignore the population of the fourth city of our nation and be influenced in our decision by what the next question might have been."

In a preceding paragraph the court had pointed out that:

"The witness himself is not the sole judge of whether his testimony will tend to incriminate himself, but he must answer a question put to him unless the answer may actually tend to criminate him."

*Bradley v. Clark*, 133 Cal. 196 (65 P. 395), was an action instituted by an elector of the city of Sacramento, California, under the provisions of the California Purity of Election Act to contest the right of the defendant mayor-elect of the city to his office. The complaint charged among other things that the defendant spent large sums of money for illegal purposes in his campaign, and that he made promises unlawfully to bestow the patronage of his office. These charges named one B. W. Cavanaugh as the prospective recipient of some of the promised favors and the actual recipient of some of the money. Upon the trial, Cavanaugh was called as a witness by the plaintiff and was asked: "Were you present at any time between the 2d day of October and the 7th day of November, 1899, when a conversation occurred with the defendant with reference to the payment of any money for campaign expenses?" The witness declined to answer, claiming the benefit of the privilege against self-crimination. The trial judge sustained the witness' objection. In holding that error was thus committed, the supreme

court declared: "No conceivable answer which the witness might properly give would or could tend to criminate him." It pointed out that the question was "manifestly but a preliminary question, answerable by 'yes' or 'no' ".

In *Abrams v. United States*, 64 Fed. (2d) 22, the witness had been penalized in the district court for refusing to answer a series of questions propounded to him by a grand jury, which was investigating election frauds. After being asked to name the place of his residence, the following inquiries were made:

"Q. Are you the Democratic captain of the Fourth Election District of the Fourth Assembly District in New York County?
\* \* \*

"Q. Where was the polling place of the Fourth Election District of the Fourth Assembly District at the last elections?
\* \* \*

"Q. Were you present in the polling place of the Fourth Election District of the Fourth Assembly District at the last election?
\* \* \*

"Q. Are you acquainted with the persons who acted as inspectors of the Fourth Election District of the Fourth Assembly District at the last election?
\* \* \*

"Q. Did you file a report with your district leader of the result of the vote cast in the Fourth Election District of the Fourth Assembly District at the last election?
\* \* \*

"Q. Were you present in any polling place other than that of the Fourth Election District of the Fourth Assembly District on Election Day?"

He declined to answer these questions, invoking the privilege against self-crimination. In sustaining his conviction, the circuit court said:

"A proper disposition of the claims of the appellant seems to be plain if one takes the questions he refused to answer and inquires whether within reason it can be said that a truthful answer, whatever the fact may have been, to any of them, would have had any tendency to incriminate him. Having said that he lived somewhere else, that is, other than at the address already given, he was merely asked where. It is impossible to understand how the answer could have had any tendency to incriminate, and he did not then say that it would. It was surely not a violation of law either to be or not to be the Democratic captain of the election district concerning which inquiry was made; nor to know or not to know, the location at the then last election of the polling place in that district; nor to have been, or not to have been, present at that polling place at the then last election; nor to have been, or not to have been, acquainted with the persons who acted as inspectors in that district at the then last election; nor to have made, or not to have made, to a district leader a report of the result of the vote then and there cast; nor to have been present, or not to have been present, at any other polling place on that day."

In so ruling, the court declared that a trial judge, in passing upon a claim of the privilege, "is not without both duty and power".

In *State v. Wood,* 99 Vt. 490 (134 Atl. 697, 48 A. L. R. 985), the court held that a woman who had been transported through Vermont and into New York for immoral purposes could not claim a privilege against self-crimination, and thus escape the witness stand. It held that under the facts before it neither the Vermont White Slave Traffic Statute nor the law prohibiting prostitution justified the witness' claim of privilege.

In *In re Stewart,* 121 Wash. 429 (209 P. 849), a seventeen-year-old girl, against whom an information was pending, charging her with being a dependent or

delinquent child, was called as a witness in the case of *State v. Opie Stafford.* The nature of the charge against the latter is not disclosed. Over her claim that to answer would tend to her crimination, she was directed to answer whether she was acquainted with Stafford and then to tell where the two went October 28, 1920. Next, over her continued objections, she was directed by the trial judge to state the various places she and Stafford visited October 28, 1920, to specify the hours when the visits were made and to name the persons they saw. Finally, even when ordered to do so by the trial judge, she refused to answer a question which asked for the hour of night when she and Stafford reached a place named in the question. She was then adjudged in contempt and later appealed. In sustaining her conviction, the Washington supreme court declared:

"Though having in mind the sacredness of the privilege asserted, we can not, from the information afforded us by the record, say that any direct answer to any of these questions would tend to criminate the witness. * * * The trial court with his greater knowledge, and no doubt having in mind the well established rule of law as herein quoted, and his duty under that rule, evidently was of the opinion that no possible direct answer could have tended toward the crimination of the witness, and the record presents nothing from which we are able to say that he erred."

*McGorray v. Sutter,* 80 Ohio 400 (89 N. E. 10, 24 L. R. A. (N. S.) 165, 131 Am. St. Rep. 715), was a habeas corpus proceeding to review a judgment finding the petitioner guilty of a contempt in declining to answer questions put to her by the prosecuting attorney in the trial of one Geer, who was accused of having procured a criminal abortion upon the petitioner. The questions propounded to the witness were: "What, if anything,

did you say to him, or he say to you?" and "Did the doctor administer to you any treatment in July of this year, in his office at the time you testified the other day that you first saw him?" In sustaining the conviction, the Ohio supreme court said:

"Should the claim of the witness be conclusive in a case of that character? The answer to that question seems to be suggested by the aphorism that the law regards substance rather than form. * * * But it would be a departure from the principle, and a perversion of the rules stated, to hold that the witness may use the immunity to prevent the discovery of the truth in the case in which he is called, or to shield himself from mere embarrassment or humiliation. The end of the rule is protection of the witness from giving testimony which would tend to convict him of a criminal offense. Certainly the modes of inquiry to which the trial judge may resort to ascertain that the claim of the witness is not well founded must not invade his immunity. * * * But if, in any mode consistent with the immunity, he may acquire the basis of a clear conviction that the claim of the witness is ill founded, he may require him to answer."

From *O'Connell v. United States*, 40 Fed. (2d) 201, we quote:

"Many of the questions were merely whether he was acquainted with certain persons, who presumably were thought by the grand jury to have some connection with the pool. An answer of 'Yes' or 'No' to such questions could have no direct tendency to incriminate him. The danger was much more remote than in Mason v. United States, supra. He claimed his privilege in response to some twenty-five questions. They were all innocuous, except, perhaps, those relating to whether he had placed bets through the Albany pool. If those be excluded, and also questions which he answered after direction by the court on the prior hearing, there are still plenty left of a type which he could not refuse to answer, as the court had already explained to him. His

persistence in prematurely claiming the privilege and refusing to answer well justified a finding of contumacy.''

Further, the court declared:

. ''The appellant was not privileged to refuse to answer unless his answer would have a direct tendency to incriminate him; a remote or speculative possibility of danger is not enough.''

In *Mason v. United States*, 244 U. S. 362 (61 L. Ed. 1198, 37 S. Ct. 621), the conviction of two men, Mason and Hanson, for a contempt of court was sustained when the court failed to find in the record any reasonable ground to support a belief that the men would have endangered themselves by answering questions submitted to them by a grand jury which was investigating a charge of gambling against six other men. The facts were that each of the two appellants was seated at a table in the Arctic Billiard Parlors, Nome, Alaska. Mason was asked: ''Was there a game of cards being played on this particular evening at the table at which you were sitting?'' and ''Was there a game of cards being played at another table at this time?'' Hanson was asked similar questions. For their refusal to answer, the two were adjudged guilty of contempt. In sustaining their conviction, the Federal supreme court stated:

''The constitutional protection against self-crimination 'is confined to real danger and does not extend to remote possibilities out of the ordinary course of law'. Heike v. United States, 227 U. S. 131, 144; Brown v. Walker, 161 U. S. 591, 599, 600. In The Queen v. Boyes (1861), 1 B. & S. 311, 329, 330, Cockburn, C. J., said:

'It was also contended that a bare possibility of legal peril was sufficient to entitle a witness to protection; nay, further, that the witness was the sole judge as to whether his evidence would bring him into danger

of the law; and that the statement of his belief to that effect, if not manifestly made *mala fide,* should be received as conclusive. With the latter of these propositions we are altogether unable to concur. * * * To entitle a party called as a witness to the privilege of silence, the Court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend danger to the witness from his being compelled to answer. * * * Further than this, we are of opinion that the danger to be apprehended must be real and appreciable, with reference to the ordinary operation of the law in the ordinary course of things— not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. We think that a merely remote and naked possibility, out of the ordinary course of the law and such as no reasonable man would be affected by, should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios,* protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice'. * * * The general rule under which the trial judge must determine each claim according to its own particular circumstances, we think, is indicated with adequate certainty in the above-cited opinions. Ordinarily, he is in much better position to appreciate the essential facts than an appellate court can hold and he must be permitted to exercise some discretion, fructified by common sense, when dealing with this necessarily difficult subject. Unless there has been a distinct denial of a right guaranteed, we ought not to interfere. In the present case the witnesses certainly were not relieved from answering merely because they

declared that so to do might incriminate them. * * * No suggestion is made that it is criminal in Alaska to sit at a table where cards are being played or to join in such game unless played for something of value. The relevent statutory provision is § 2032, Compiled Laws of Alaska, 1913, copied in the margin. The court below evidently thought neither witness had reasonable cause to apprehend danger to himself from a direct answer to any question propounded and, in the circumstances disclosed, we can not say he reached an erroneous conclusion.''

The rule as stated in 28 R. C. L., Witnesses, p. 427, § 12 and p. 429, § 14, is much quoted:

''It is essential to the existence of the right not to testify that the danger to be apprehended is real and appreciable, with reference to the ordinary operation of law, in the ordinary course of things, not a danger of an imaginary and unsubstantial character, having reference to some extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct. The law does not permit a witness arbitrarily to hide behind a fancied or intangible danger to himself. * * * It is now settled, both in England and in this country, that it is the province of the court to determine in the first instance under all the circumstances of the case whether any direct answer to a proposed question has a tendency to criminate a witness, and, of course, it is the duty of the court, while it protects the witness in the due exercise of his privilege, to take care that he does not, under the pretense of defending himself, screen others from justice, or withhold evidence which he might safely give. Otherwise, it would be in the power of every witness to deprive parties of the benefit of his testimony by a merely colorable pretense that his answers to questions would have a tendency to implicate him in some crime or misdemeanor, or would expose him to a penalty or forfeiture, when it is clear that the questions have no such tendency. The court must be able to discern from the character of the question

and the other facts adduced in the case some tangible substantial probability that the answer of the witness might help to convict him of a crime. Sometimes it may be difficult to discern the dividing line, but in all such cases the doubt should be solved in favor of the witness. * * * For the purpose of this discussion a question that criminates, or tends to criminate, a witness may be defined as one the answer to which will show, or tend to show, him guilty of a crime for which he is yet liable to be punished.''

From *In re Dewar*, 102 Vt. 340 (148 Atl. 489), we quote:

"Whatever the rule formerly may have been in this country or elsewhere,·it is now fully established that it is not left to the witness, exclusively, to say when he is entitled to the privilege of silence. The right of the state or of individuals to have the benefit of the testimony of every person having relevant knowledge is not to be disregarded to that extent, nor are the enforcement and administration of the laws to be so unduly embarrassed. The ultimate decision of the witness' right to refuse to testify is for the court. State v. Wood, 99 Vt. 490, 134 Atl. 697, 48 A. L. R. 985. But where, as here, no issue of fact is involved, the question which the court is required to pass upon is one of law, the decision of which must accord with established rules.''

It is unnecessary to review the authorities any further. In the above paragraphs we have mentioned but a few of the many that are available. The trend of the great mass is thus stated in 70 C. J., Witnesses, p. 751, § 909:

"The modern rule is that the trial court is first to determine whether in law, under all the circumstances, the witnesses should be accorded the privilege.''

Thus, it will be seen that the rule as expressed and applied by Chief Justice Marshall in the Burr

decision is followed virtually everywhere today. In 19 Minn. Law Rev. 426, the writer states:

"There are several English authorities which hold that a witness is the sole judge of whether answering a certain question would tend to incriminate him and there are also several American authorities which lean that way."

The writer then continues and points out that the English decisions, which indicated that the witness' claim was final, preceded *Regina v. Boyes*, 1 B. & S. 311 (30 L. J. Q. B. 301), and *Ex parte Reynolds*, 20 Ch. Div. 294 (51 L. J. Ch. 756), which, according to the author just mentioned, "settled it that the witness is not the sole judge and that it is for the court to determine, under all the circumstances of the case and the nature of the evidence which the witness is called to give, that there is 'reasonable ground' to apprehend danger". Concerning the early American decisions which indicated that the witness' decision in his own favor was final, the same writer states:

"Likewise, it may be said for the early American cases that they were either dicta or the language of the opinions was inaptly chosen, thus giving the impression that the decisions supported a rule making the witness the sole judge. * * * The unqualified statements that the witness is the judge usually appear in respect to questions that are of an incriminating nature where the witness is entitled to the privilege in any event."

The contributions made by the decisions which have been written since *United States v. Burr*, supra, have taken the form of specifying more clearly the nature of the judge's duty when a claim to the privilege is voiced, and the circumstances under which the claim may be denied. As we have seen, the great expounder recognized the trial judge's duty, and in performing

it directed the witness to answer. The clarifying tendency of the later decisions is thus expressed in 19 Minn. Law Rev. 426 by the writer from whom we have previously quoted:

"The court shall determine whether there is reasonable ground to apprehend danger under all the circumstances of the case, including the evidence sought to be adduced in the particular case. This rule is now well settled although the courts use different language in stating it. Some state that there must be 'a real danger'. Others add that there must be reasonable ground to apprehend danger 'under the ordinary course' of things. Still others say that there must be a 'direct' tendency to incriminate."

As is manifest, the criminating or noncriminating character of a question will frequently appear upon its face. If it does not, a difficulty confronts the trial judge which the decisions have given a semblance to the problem of burden of proof, according to Justice Mitchell in *State v. Thaden*, 43 Minn. 253 (45 N. W. 447). The difficulty he, however, deems "theoretical, rather than practical". The decision written by him states:

"The best practical rule is that laid down in some of the English cases, and adopted and followed by Chief Justice Cockburn, in Reg. v. Boyes, * * * 'that, to entitle a party called as a witness to the privilege of silence, the court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend danger to the witness from his being compelled to answer'. To this we would add that, when such reasonable apprehension of danger appears, then, inasmuch as the witness alone knows the nature of the answer he would give, he alone must decide whether it would criminate him."

Nothing contained in the decisions cited by the appellants, nor anything contained in any decision which

has come to our attention, indicates that an inquiry whether the witness was at the scene of a crime entitles him to the privilege of silence unless facts before the court or indicated by the question show that the place was a public nuisance which no one could lawfully visit (*In re Askwith*, supra, and *In re Werner*, 46 R. I. 1 (124 Atl. 195)); or that by answering the witness would show that he himself was a participant in the crime (*In re Sales*, supra, and *In re Crow*, supra). But neither an affirmative nor a negative answer to the question which these witnesses refused to answer would have shown that they were participants in the commission of any crime; nor would their replies have placed them in a structure operated as a public nuisance. Their replies could no more have criminated them than the affirmative answers which both Mrs. Murray and Mrs. Gregg (the two neighbor women) made when they were asked whether they were present during the course of the disturbance. In fact, affirmative replies would not have been as dangerous to the appellants as the replies exacted by the court in many of the decisions above reviewed. But the appellants seem to believe that, while they have not named any crime with which the affirmative replies would have associated them, they were, nevertheless, entitled to the privilege as protection against the possibility that the state might turn against them after they had admitted their presence in the hall and seek their indictment. No such possibility is indicated as likely by the record. We have seen from the numerous authorities reviewed above, especially *United States v. Miller, Abrams v. United States, McGorrey v. Sutter,* and *Doyle v. Hofstader*, that questions which inquire of a witness whether he was present are deemed as merely preliminary, unless, as already said, the place

mentioned in the question is a public nuisance. The witness is not permitted to surmise that further ques-. tions will follow which will tend to convict him of some wrongdoing. To permit a witness otherwise innocent of wrongful conduct, to refuse to answer whether he was present when the alleged crime was committed, merely because the state might turn upon him next, would produce an intolerable condition. If a witness could claim the privilege of silence for that reason, the only witnesses available to either party would be those who, through animosity toward one side or the other, were anxious to give vent to their spleen, and those rare individuals who, through a wholesome sense of civic duty, disdained to claim the privilege. If the privilege were so easily obtainable, then each eyewitness could determine for himself whether he would testify, and the right to the compulsory attendance of witnesses (Constitution of United States, Amendment VI, and Constitution of Oregon, Art. I, § 11), would be valueless. Eyewitness testimony would then be available only as a favor, and justice would be at the sufferance of those who were willing to testify. The possibility that the state might seek to indict a witness after he has replied that he was present at the time the crime was committed has never yet been deemed a reasonable basis for apprehension of danger.

In the present instance, these four appellants, far from being aggressors on August 20, 1934, were among the victims of the attack. The alleged riot was on the outside of the structure, not on the inside. The appellants threw no rocks, uttered no aggravating words, aimed no blows and pointed no guns. Their only activity during the course of the affray was to search in the hall for safe havens of refuge. They can not employ the privilege against self-crimination for the

benefit of the men whom they offended during the course of the strike, in the hope that their silence may restore friendly relationships. The privilege is a shield and not an olive branch. Its purpose is not to help the guilty escape, but to afford the innocent a protection which is deemed necessary. The privilege is a personal one, incapable of assignment. It is available only when the witness is in real danger of being forced to utter from his own unwilling lips testimony which later may be used for his own prosecution, or to disclose the sources where evidence against himself may be obtained. His claim is subject to judicial scrutiny, and the court must see from the circumstances that the claim to the privilege is not a mere pretense. It must appear that the witness has reasonable ground for his apprehension of danger; if he has not, it is the duty of the judge to point out his mistake. But the witness' oath that he is in danger is entitled to much weight, especially when the court can not know what the answer to the question will be. In the present instance, the answer must have been "yes" or "no". Neither of those answers would have criminated any of the witnesses. Neither "yes" nor "no" would have indicated that these men were rioters, heavers of missiles, or carriers of guns. Neither "yes" nor "no" would have placed these four men in any different condition than their 60 or 70 companions in the hall. Possibly, a later question would have entitled them to make the claim, but the question which they declined to answer was a purely preliminary one. Their claim was made too soon.

It is our belief that the circuit court did not err when it directed the witnesses to answer, and when it later, upon their continued refusal, adjudged them guilty of a contempt.

The four judgments from which these appeals have been taken are affirmed.

KELLY, BELT and RAND, JJ., concur.

BAILEY, J., concurs in the result.

---

CAMPBELL, C. J. (dissenting). From the statement of the case in respondent's brief, we gather that during the month of August, 1934, and for some time prior thereto, there was a disagreement and dispute between two groups of longshoremen in Portland, Oregon. The longshoremen of one group, the International Longshoremen's Association, were hired from a "hiring hall" at Northwest Ninth Avenue and Everett street. The other group, the Columbia Rivermen's Association, engaged a hall at Northeast Fourteenth Avenue and Alberta street at which it met and from where its members were hired. On the morning of August 20, 1934, between the hours of 7:30 o'clock and 9 o'clock, a. m., about 70 members of the Columbia Rivermen's Association met at their hall, and, while there, a group of men from the International Longshoremen's Association came to the hall and a riot immediately ensued. Rocks were thrown through the windows, and several shots were fired, some from without the hall, and some from within. The riot lasted but a short time and when it was over, one man was found inside the hall, shot to death. Just who fired the shot, or whether it was fired from within the hall or without the hall is in dispute.

There is evidence before us amply supporting this statement made by the learned district attorney.

A preliminary hearing was had before the municipal judge of the city of Portland sitting as a com-

mitting magistrate at which hearing Jennings and Abbott testified that they were at the hall at Northeast Fourteenth Avenue and Alberta street on the morning of August 20, 1934, at the time of the riot. The other two appellants made statements to the district attorney at that time to the same effect.

Thereafter an indictment was returned jointly charging 34 defendants with the crime of participating in a riot. These appellants were not indicted. Nor does it appear that any of those belonging to the Columbia Rivermen's Association were included in this indictment. One of said defendants, Ed Shearer, demanded a separate trial, which request was granted. When the cause came on for trial, Arthur Rust, Paul Jennings, C. N. Abbott and Karl Tigert, the appellants herein, were called as witnesses for the state. Each testified that at the time of the riot they were members of the Columbia Rivermen's Association.

Paul Jennings, during examination was asked the following question:

"Q. Now, during August, well, I will say the 20th of August last year, were you present out at the hall at 14th and Alberta, the morning—that is, the morning of August 20th, at approximately between 7:30 and 9 o'clock?"

The witness declined to answer the above question on the ground that the answer would tend to incriminate him.

The other three appellants were also called as witnesses for the state and were asked substantially the same question. They all declined to answer for the same reason. Their privilege of exemption was claimed with courtesy and respect to the court, and the only matter complained of is their refusal to answer the question.

The court considered the matter at quite some length. The court in its order adjudging these appellants in contempt of court recited:

"* * * whereupon the undersigned judge of said court, having made an investigation of the facts and circumstances relative to whether the answer of said question by the said witness would have a direct tendency to subject him to punishment for a felony, directed said witness to answer said question * * *."

The record of the aforementioned preliminary hearing consisting of nearly 2,000 pages of typewritten matter containing some testimony, many objections and much argument between counsel, was filed in this court. It was stipulated that it could be considered as part of the record in these contempt proceedings. The learned trial judge finally instructed appellants to answer the question, and on their refusal so to do, adjudged each one of them in contempt of court. From that order, this appeal is taken.

The question presented by this appeal is not without its difficulties. It is a question that has been before the courts of this country and of England many times. The Constitution of the United States (Fifth Amendment to the Constitution of the United States) and that of every state in the Union, including this state, has a provision of similar effect which provides that no person shall, "* * * be compelled in any criminal prosecution to testify against himself.": Constitution of Oregon, Article 1, § 12. The question in this case appears to be one of original impression in this court.

While the provision of the Constitution of the United States is only binding on the United States courts, the reasoning and the logic of the cases which arose in those courts on this question are of great

value in aiding us to reach a proper determination. The question first arose in the United States courts in the case of *United States v. Burr*, Coombs Trial of Aaron Burr, 67, Case No. 14692e (*In re Willie*), 25 Fed. Cas. 38. In that case a man by the name of Willie who was secretary to Burr, was called as a witness. He was asked if he could explain a letter in cipher, alleged to have been in his handwriting and written by Aaron Burr. He refused to answer the question on the ground that it would tend to incriminate him. Counsel contended that the witness was the sole judge of answering or refusing to answer. It was pointed out by Chief Justice Marshall that there may be questions to which no "direct" answer would in any degree affect the witness and that there was no case that went so far as to say that the witness is not bound to answer such question. The opinion of the chief justice on that question announced the principles that the courts in the various states have since followed, the only difference being as to the facts in which the principles were applied. The opinion of the chief justice, in the Burr case, is in part as follows:

"When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent. The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. * * * When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it may criminate himself, then he must be the sole judge what his answer would be. The court can not participate with him

in this judgment, because they can not decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims. It follows necessarily then, from this statement of things, that if the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he say upon his oath that his answer would criminate himself, the court can demand no other testimony of the fact. * * *

"The gentlemen of the bar, will understand the rule laid down by the court to be this: It is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such answer may disclose a fact which forms a necessary and essential link in the chain of testimony, which would be sufficient to convict him of any crime, he is not bound to answer it so as to furnish matter for that conviction. In such a case the witness must himself judge what his answer will be; and if he say on oath that he can not answer without accusing himself, he can not be compelled to answer."

The above doctrine has been applied in numerous cases, and summed up by the supreme court of Minnesota, speaking through Mr. Justice Mitchell in *State v. Thaden*, 43 Minn. 253 (45 N. W. 447), as follows:

"While no principle of the common law is more firmly established than that which affords a witness the privilege of refusing to answer any question which will criminate himself, yet its application is attended with practical difficulties. To hold that the witness himself is the sole and absolute judge whether the answer will criminate him would be to place it in his power to withhold evidence whenever he saw fit. Such a rule could not be tolerated for a moment. On the other hand, to require him to state what answer he would have

to give, or to explain fully how his answer would tend to criminate, would deprive him of the very protection which the law designs to afford. Moreover, the reason of the rule forbids that it should be limited to confessions of guilt, or statements which may be proved in subsequent prosecutions as admissions of facts sought to be established therein; but it should be extended to the disclosure of any fact which might constitute an essential link in a chain of evidence by which guilt might be established, although the fact alone would not indicate any crime. Hence the problem is how to administer the rule so as to afford full protection to the witness, and at the same time prevent simulated excuses. All the authorities agree to the general proposition that the statement of the witness that the answer will tend to criminate himself is not necessarily conclusive, but that this is a question which the court will determine from all the circumstances of the particular case, and the nature of the evidence which the witness is called upon to give. But the question on which the cases seem to differ is as to what we may call the burden of proof; some holding that the statement of the witness must be accepted as true, unless it affirmatively appears from the circumstances of the particular case that he is mistaken, or acts in bad faith, while other cases hold that, to entitle a witness to the privilege of silence, the court must be able to see, from the circumstances of the case and the nature of the evidence called for, that there is reasonable ground to apprehend danger to the witness, if he is compelled to answer. * * * The difference is theoretical, rather than practical; for it would be difficult to conceive of an instance where the circumstances of the case, and the nature of the evidence called for, would be entirely neutral in their probative force upon the question whether or not there was reasonable ground to apprehend that the answer might tend to criminate the witness. After consideration of the question and an examination of the authorities, our conclusion is that the best practical rule is that laid down in some of the English cases, and adopted and followed

by Chief Justice Cockburn, in *Reg. v. Boyes*, [1 B. & S. 311, 30 L. J. Q. 301]   *   *   *   'that, to entitle a party called as a witness to the privilege of silence, the court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend danger to the witness from his being compelled to answer'. To this we would add that, when such reasonable apprehension of danger appears, then, inasmuch as the witness alone knows the nature of the answer he would give, he alone must decide whether it would criminate him. This, we think, is substantially what Chief Justice Marshall meant by his statement of the rule in the Burr trial.''

Of this opinion, Dean Wigmore makes the following observation: "This summing-up of Mr. Justice Mitchell leaves nothing to be added, and ought to remain the last word in the development of the rule." Wigmore on Evidence (2d Ed.), 892, § 2271.

In the instant case, there was a riot taking place at the Alberta street hall on the morning of August 20, 1934, between 7:30 o'clock and 9 o'clock a. m. This in itself was a crime for which everyone unlawfully participating therein was subject to a criminal prosecution. During the riot a homicide was committed. The dead body was discovered within the hall. Shots were fired into and out of the building. No one knows who fired the shot that caused the homicide. The guilty person has never been discovered or apprehended. In order to convict one of a crime, two of the "necessary and essential" elements that must be proved by the state are the time and place of the crime charged, and in most cases, that the defendant was present at that time and place. The appellants admitted membership in that group of longshoremen who were within the hall at the time of the riot. If they should further

admit that they were present at the time and place of the riot, it would certainly tend to establish these two essential elements of the crime, and that they were present when and where the crime was committed. This would be true not only of the riot but of the homicide.

A highly interesting and instructive discussion of this entire question will be found in 19 Minn. Law Review 426, in an article entitled "Rules Governing the Allowance of the Privilege Against Self-Incrimination", by Max P. Rapacz, Professor of Law, DePaw University College of Law.

Appellants had the right to claim the privilege.

It is also contended that because the appellants Jennings and Abbott testified at the preliminary hearing in the municipal court to the effect that they were present at the hall at the time of the riot, that they have thereby waived their privilege.

It is well settled that a person who has waived such privilege in one trial or proceeding is not estopped to assert it as to the same matter in a subsequent trial or proceeding.

"Nor did the fact that the petitioners testified before the grand jury constitute a waiver of their right to claim the privilege at the trial of the action. Overend v. Superior Court, 131 Cal. 280 (63 P. 372); In re Berman, supra." *Ex parte Sales*, 134 Cal. App. 54 (24 P. (2d) 916).

"The privilege not to give self-incriminating evidence, while absolute when claimed, may be waived by anyone entitled to invoke it. However, it is well settled that a person who has waived such privilege in one trial or proceeding is not estopped to assert it as to the same matter in a subsequent trial or proceeding, because the privilege attaches to the witness in each particular case in which he may be called on to

testify, and whether or not he may claim it is to be determined without reference to what he said when testifying as a witness on some other trial, or on a former trial of the same case and without reference to his declaration at some other time or place.'' 28 R. C. L. 422. Also see Wigmore on Evidence, 2d Ed. 920, § 2276 (4); and note in Ann. Cas. 1916C, 1012; also see note in 8 So. Cal. Law Review 51.

From the record presented in this court, we arrive at the conclusion that the circuit court erred in adjudging these appellants guilty of contempt.

The order should be set aside and the case remanded with instructions to release the appellants.

I dissent.

BEAN, J., concurs.