[Crim. No. 1759.   First Appellate District, Division One.—August 26, 1933.]

In the Matter of the Petition of EUGENIA SALES for a Writ of Habeas Corpus.

Thomas M. Carlson, Wilbur S. Pierce, Robert Collins and Marvin B. Sherwin for Petitioner.

James F. Hoey, District Attorney, Warren Cunningham, Deputy District Attorney, and Lewis F. Byington for Respondent.

KNIGHT, J.—The petitioner Eugenia Sales and one Pastor Santellian were produced as witnesses for the People at the trial of a criminal action in the Superior Court in and for Contra Costa County, and after being sworn refused to answer the questions propounded by the district attorney upon the ground that their answers would tend to incriminate them. The court instructed them to answer but they still refused so to do, and thereupon they were adjudged guilty of contempt and each was sentenced to five days' imprisonment in the county jail and to pay a fine of $400

or in default of such payment to be imprisoned in said county jail at the rate of one day for each $4 of the said fine until said fine was satisfied. Upon being taken into custody by the sheriff of said county in obedience to the judgment of sentence they applied to this court for and were granted writs of *habeas corpus,* the ground urged therefor being that under the attending circumstances they were legally justified in claiming the benefit of the privilege afforded by the constitutional guarantee that no person shall be compelled in any criminal action to be a witness against himself.

The two proceedings were heard as one, and the following are the facts, as they appear from the record: The criminal action in which petitioners were called upon to testify was one wherein several persons named Leon Kintanilla, Mrs. Theresa Kintanilla, V. Kang, E. Codog, Alberta Asis, Maria Galvez and R. Costillo were indicted jointly and being tried for the murder of a young married woman named Cecelia Novarro. All of the accused persons, many of the witnesses including petitioners, and Mrs. Novarro, were Filipinos; and all except the petitioner Santellian belonged to a lodge or society which restricted its membership to persons of that nationality. The prosecution claimed and sought to prove that at a meeting of the lodge held in Stockton on the night of November 20, 1932, Mrs. Novarro was placed on trial for certain alleged matrimonial misconduct, and that at the conclusion of the trial was taken blindfolded in an automobile, driven to an isolated spot on an island in Contra Costa County and there thrust into an excavation and buried alive. The indictment charging these persons with the commission of the murder was founded in part at least on the testimony given before the grand jury by these petitioners, and, according to the affidavits filed herein by the district attorney, petitioners, subsequent to the finding of the indictment and prior to the commencement of the trial, confirmed the truth of the testimony given by them before the grand jury and agreed with the district attorney to again so testify at the trial. The testimony given by them before the grand jury as it is shown by the reporter's transcript thereof was substantially as follows: Eugenia Sales stated that she was a member of said lodge or society and attended the meeting thereof in Stockton on the night in question; that one of

the purposes of the meeting was to investigate the alleged misconduct of Mrs. Novarro, and that petitioner was present in the lodge-room part of the time the investigation was going on, but that she did not know what determination had been made thereof. However, at the close of the session, so she stated, she was told by Mrs. Kintanilla to go along with others, including Mrs. Novarro, in an automobile driven by Kintanilla; that the other occupants of the car were Mrs. Novarro, Mrs. Kintanilla and four other women; that they drove out to the island and upon arriving there sat in the car for a few minutes until someone came up and said "everything is ready"; that she was then instructed to get out of the car and follow the others; that Mrs. Novarro's face was "bandaged", her body wrapped "with something", and she was crying; that after proceeding some distance they reached "the big hole in the ground there" and that she saw some of the women push Mrs. Novarro into the hole and then throw "dirt on top"; after which they returned to the automobiles and drove away.

Santellian stated that he was a resident of Pittsburg, Contra Costa County; that his wife was a member of said society but that he was not; that on the evening in question he took his wife to Stockton in an automobile to attend said meeting, and waited outside for her; that later on during the evening a number of women came down from the lodge-room, among them being the defendants, Mrs. Kintanilla, Mrs. Asis and Mrs. Galvez; that they told him that they wanted him to drive some of the women in his car out to the island; that he protested against doing so, and that Mrs. Asis "pinched" him and told him to go and to follow the other car driven by Kintanilla; that although he knew "something was going to happen to Mrs. Novarro" he did not know exactly what was going to be done with her; that he pleaded with those present to forgive her, to let her go, stating that she was going back to Honolulu, but that both Mrs. Asis and Mrs. Galvez told him that they were going to punish her and that they would not let her go; that after driving some distance Mrs. Asis told him to stop the automobile, and he did; that the women got out of the car, and that he then learned that they were going to put Mrs. Novarro "down in a hole"; that he protested again, but that Mrs. Galvez told the others to "go on, go ahead"; that Mrs. Galvez then took

hold of Mrs. Novarro's arm and shoulder on one side, and Mrs. Asis took her by the arm and shoulder on the other side, and accompanied by the others they disappeared in the darkness, going toward the hole; that about half an hour afterwards they returned, but Mrs. Novarro was not with them; that they then re-entered the automobiles and drove back to Stockton.

As before stated, however, when petitioners were produced as witnesses at the trial and the district attorney sought to elicit from them the foregoing facts they refused to testify upon the ground that their answers would tend to incriminate them.

The powers a trial court may exercise and the rights and privileges a witness may claim under said constitutional privilege are clearly defined in a number of cases, among them being *In re Berman,* 105 Cal. App. 37 [287 Pac. 126]. Many of the earlier authorities are there cited and discussed, the most outstanding of which is the case of *United States* v. *Burr* (*In re Willie,* 25 Fed. Cas. 38), wherein Chief Justice Marshall laid down certain rules for guidance which, as stated in the Berman case, have since been followed universally in all jurisdictions.. The learned Chief Justice there said: ''When a question is propounded, it belongs to the court to consider and to decide whether any direct answer to it can implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which is secured to him by law. If a direct answer to it may criminate himself, then he must be the sole judge what his answer would be. The court cannot participate with him in this judgment, because they cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims. It follows necessarily then, from this statement of things, that if the question be of such a description that an answer to it may or may not criminate the witness, according to the purport of that answer, it must rest with himself, who alone can tell what it would be, to answer the question or not. If, in such a case, he say upon his oath that his answer would criminate himself, the court can demand no other testimony of the fact. If the declaration be untrue, it is in conscience and in law as much a perjury as if he had declared any

other untruth upon his oath; as it is one of those cases in which the rule of law must be abandoned, or the oath of the witness be received. The counsel for the United States have also laid down this rule according to their understanding of it; but they appear to the court to have made it as much too narrow as the counsel for the witness have made it too broad. According to their statement a witness can never refuse to answer any question unless that answer, unconnected with other testimony, would be sufficient to convict him of a crime. This would be rendering the rule almost perfectly worthless. Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible but a probable case that a witness, by disclosing a single fact, may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom he is safe; but draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description.''

Applying the foregoing rules to the cases of these petitioners, it becomes evident that they were entitled to the benefit of the privilege granted by the provisions of said constitutional guarantee, because manifestly the admission or confession on their part that they were among those who took the unfortunate Mrs. Novarro out to the place where it is claimed she was murdered, that they knew at the time she was removed from the automobile that she was to be done away with, and that one of the petitioners was present when Mrs. Novarro was shoved into the excavation and covered with earth, could be urged against them afterwards as strong circumstances tending to establish that they, too, were principals in the commission of the crime. True, as pointed out by the district attorney, both petitioners claimed in effect that up to the time they arrived at the scene of the crime they were unaware of the manner in which Mrs. Novarro was

to be punished, and Santellian claimed that after he learned what was to be done he protested against it; but these circumstances alone would not exculpate them from criminal responsibility; and in any event the truth of their statements in this regard would be for a jury to pass upon, in case petitioners were thereafter charged with being parties to the crime; and, if rejected, their admissions that they were present at the scene of the crime at the time it was perpetrated, together with the other admissions above mentioned, would doubtless serve as incriminating facts tending to establish their guilt. Under such circumstances, petitioners, in our opinion, were entitled to claim said privilege. As stated in *People ex rel. Taylor* v. *Forbes,* 143 N. Y. 219 [38 N. E. 303, 306], cited in the Berman case, if to the mind of the witness the testimony he is called upon to give "may constitute a link in the chain of testimony, sufficient to convict him, when other facts are shown, or to put him in jeopardy, or subject him to the hazard of a criminal charge, indictment or trial, he may remain silent".

The district attorney contends that petitioners in seeking to invoke the aid of said constitutional privilege are doing so for a fraudulent purpose; that they did not decline to testify because of any fear that their answers would be incriminating or subject them to prosecution for the commission of the crime; that their real purpose in so refusing was to shield and protect those who were then on trial for the commission of the crime. There are doubtless good grounds for so believing; nevertheless the attending circumstances as they are shown by the record before us are such as to place petitioners in the position where they may legally claim the benefit of the constitutional privilege, and that being so, under the decision in the Berman case, it can make no difference what other purpose they may have sought to serve by their silence.

The district attorney also cites authorities to the effect that a person may enter into a contract to waive said constitutional privilege in which event he may be thereafter estopped from claiming the same; and in this connection it is contended that petitioners' agreement to testify at the trial to the same state of facts revealed by them before the grand jury constituted such a contract. We are unable to sustain this view. The action is one instituted and prosecuted by

and in the name of the People of the state for the alleged commission of a crime; and consequently there can be no contractual relationships with the witnesses. In other words, any person having knowledge of material facts connected with the commission of a crime may be compelled to testify thereto regardless of his personal inclinations, unless as here his testimony would tend to incriminate him; and any agreement attempted to be made by him as to whether or not he would testify would be wholly void and no rights whatever would be created thereunder. ▮ Nor did the fact that petitioners testified before the grand jury constitute a waiver of their right to claim the privilege at the trial of the action. (*Overend* v. *Superior Court,* 131 Cal. 280 [63 Pac. 372]; *In re Berman, supra.*)

For the reasons stated it is our opinion that the imprisonment of the petitioner Eugenia Sales pursuant to said judgment of contempt is illegal; and therefore so far as her commitment thereunder is concerned she is discharged from custody.

Tyler, P. J., and Cashin, J., concurred.