## Commonwealth v. Bane et al.

*Roy P. Hicks*, Special Deputy Attorney General, *Ralph W. Peacock*, Special Deputy, and *Claude T. Reno*, Attorney General, for Commonwealth.

*A. Kirk Wrenshall, John J. Moschetta, Paul J. McCormick, D. M. McCloskey, J. W. Troutman, Clarence O. Devore, D. M. Anderson, McCreight & McCreight, H. V. Fergus, Curran & Curran, Adolph L. Zeman, H. Russell Stahlman*, and *W. R. Dennison*, for defendants.

CARR, J., fourteenth judicial district, specially presiding, November 25, 1940. — The nine defendants have moved to quash 102 indictments returned by a special grand jury following its presentments recommending that bills be submitted. The reasons assigned in support of the motions allege misconduct on the part of the Commonwealth's counsel gravely prejudicial to defendants during their examination before the grand jury, and the denial of the constitutional right of defendants not to be compelled to give evidence against themselves. . . .

### Discussion

The declaration of rights contained in the Constitution of Pennsylvania (art. I, sec. 9), as well as the Fifth Amendment to the Federal Constitution, prohibits the employment of legal process to extract from a person's own

lips an admission of his guilt. This constitutional privilege and immunity protects all persons, whether parties accused in the cause or mere witnesses, from being compelled to give self-incriminating testimony. It is one of the essential features of our liberty, inseparable from the rights to freedom of speech and of conscience, exemption from military dictation, inviolability of the person and the home, a speedy and public trial by jury, and protection against oppressive bail and cruel punishment. There is no more sacred duty of a court than to maintain unimpaired those securities for the personal rights of the individual which have received for ages the sanction of the jurist and the statesman, and no narrow or illiberal construction should be given to the words of the fundamental law in which they are embodied: Ex parte Lange, 85 U. S. 163.

In the case of the ordinary witness not accused of crime, the constitutional privilege against self-incrimination is not a prohibition of inquiry. He is not exempt from all obligation to testify, but only from such answers as may tend to incriminate him. Since it cannot be assumed that his entire examination will relate to subjects which will elicit self-incriminating testimony, and it cannot be known that a particular fact desired to be inquired about relative to the inquiry will incriminate him, he may be subpœnaed, sworn, and questioned to the point where the claim of privilege may properly be asserted. His opportunity for choice does not come until some incriminating fact is asked for, and if he desires to refuse an answer he must then assert his privilege, or, failing to do so, he will be deemed to have waived it within the scope of the particular fact about which he has voluntarily answered.

There is, however, a basic distinction in the case of an ordinary witness and in the case of a party accused—that is, one whose guilt or innocence in relation to a specific offense is actually being investigated in a pending proceeding. The accused has not then the status of a witness only, but of a party whose conduct is the main subject of

the inquiry. Any question that could be asked him relative to the inquiry must have as its object the proof of the charge against him, and must necessarily tend to that point. Therefore, he cannot be called to the stand; he cannot be asked a single question; his privilege of silence is absolute: Wigmore on Evidence (3d ed.), sec. 2268.

At the time they were subpœnaed and called upon to give evidence, Bane, Powell, McBride, Pansino, Miller, Trew, Phillips and Krasas stood definitely charged with crimes against the Commonwealth. The first seven had been accused in the petition of the Special Deputy Attorney General to the court for a grand jury investigation. They were not merely suspected; they had been declared by the Commonwealth's officer to be guilty upon "competent and credible evidence" already in his possession. Krasas was under indictment at no. 233, August term, 1939, charged with violation of the lottery laws on July 11, 1939. Against Phillips the Special Deputy Attorney General had himself, on March 29, 1940, caused information to be made for maintaining gambling devices on September 15, 1939, and at divers other times before and since that date, and had extradited him from Florida. These cases against Krasas and Phillips were undisposed of. The enforced appearance of these eight defendants before the grand jury compelled them to take the stand and elect whether to be or to decline to be examined; to choose between responding fully or refusing testimony on the ground that their answers would tend to incriminate them. They were thus placed in a situation where not to speak in answer would seem to confess guilt, and be more prejudicial than to give full utterance: Commonwealth v. Valeroso, 273 Pa. 213.

The procedure in the cases before us is not that of Commonwealth v. Rhey et al., 140 Pa. Superior Ct. 340, where the court said (p. 345):

"That one or more of those who were *subsequently* made defendants were called as *witnesses* before the grand jury does not affect the regularity of the proceeding.

Since the investigation is directed against things rather than persons, the grand jury is not prohibited from calling a *witness* at the *risk* of vitiating the proceeding *if ultimately* the inquiry indicates that he is one of the offenders." (Italics ours.)

Nor is it parallel to Commonwealth v. Bolger, 42 Pa. Superior Ct. 115, 229 Pa. 597, where the court said (pp. 602-03):

"Manifestly, then, no possible infringement of the privilege can be predicated of the facts that one is summoned to appear *as a witness* before a lawful tribunal and examined upon oath. There is *no room yet for any assumption by such person* that his constitutional privilege will be impaired or denied. It is not the object of the privilege to exempt any citizen, *not a defendant*, from the obligation to appear as a witness . . ." (Italics ours.) Neither Bolger nor Rhey had been charged with any offense at the time of his examination.

It is evident from the record that the present proceeding was not one undertaken against things, but rather against particular persons. If the allegations of the Special Deputy Attorney General's petition were true, the powers of the grand jury were not needed for the purpose of discovering whether crime had been committed or by whom, for this had already been discovered and was charged against known individuals. Not needed, under these circumstances, for a legitimate purpose, the powers of the grand jury were artfully used to evade the absolute prohibition against questioning the parties accused. To sanction such odious practices by public prosecutors would be to destroy utterly the privilege against self-incrimination, and create a super-government by judicial inquisition such as we have not had to endure in the last three hundred years: 3 Wharton's Criminal Evidence, p. 1978; People of N. Y. v. Gillette, 126 App. Div. 665, 111 N. Y. Supp. 133; People of N. Y. v. Bermel, 71 Misc. 356, 128 N. Y. Supp. 524; State v. Smith, 56 S. D. 238, 228 N. W.

240 (characterized by Wigmore as an able opinion: see vol. 8 (3d ed.), sec. 2268, p. 392, note 6).

A grand jury investigation can be a valuable aid in the administration of the criminal laws, but it may not be availed of for unconstitutional interrogation of the accused. The style of the proceeding is not material. The rights of citizens depend on existing facts. They cannot be abrogated by covering up facts with convenient fictions. Nor is it material that the accused, after being subpœnaed and sworn, is told that he need not answer any questions the answers to which he thinks may incriminate him. The injury is inherent in the violence done to his rights. Whether or not the injury is susceptible of proof, it is not the policy of the law to require it. It is a matter of the highest policy that crime shall be punished by legal methods. When these are flouted, then comes the mob, between which, in the pursuit of vengeance, and the officers of the law acting in its name but in disregard of it, there is no distinction: Counselman v. Hitchcock, 142 U. S. 547.

Moreover, after they had appeared before the grand jury, in obedience to the subpœnas and not voluntarily, all the defendants (except Krasas, who was committed for refusing to testify after the court had ordered him to do so, and Protin, who did not claim privilege) were compelled to give specific and detailed evidence against themselves, on various untenable theories of waiver of privilege.

Until the day that the grand jury indicted Bane, Powell, McBride, and Phillips, following the first presentment, Bane had testified without claim of privilege; Powell and McBride, in answer to an inquiry of the prosecutor at the beginning of their examinations, had expressed themselves as willing to waive it, and testified extensively. After their indictment for conspiracy and misbehavior in office, Bane, Powell, and McBride were recalled, at which time they all refused to give further evidence against themselves. Despite the fact that their situations had changed (People of N. Y. v. Cassidy et al.,

213 N. Y. 388, 107 N. E. 713), they were compelled to continue to answer, the basis of the ruling being that by their previous testimony they had waived and could not revive their privilege, and additionally as to Powell and McBride that their agreement at the beginning of their examination to waive privilege was binding and irrevocable. Subject to the general principles of contract, waiver may result from previous contract or other binding pledge (Wigmore (3d ed.), sec. 2275), but no contractual relationship can exist between a prosecutor and a witness in a criminal case: In re Sales, 134 Cal. App. 54, 24 P. (2d) 916; People of Ill. v. Rockola, 339 Ill. 474, 171 N. E. 559; and therefore, we think that the previously expressed willingness of Powell and McBride to waive privilege, and their promises to the prosecutor to submit to examination without reserve, were subject to reconsideration and retraction at any time, certainly after they had been indicted, when, regardless of what had gone before, no theory could justify compelling them to uncover proof of the facts alleged in the indictments then pending against them. Equally arbitrary and unconstitutional, of course, was the procedure adopted in the cases of Phillips and Krasas, who were in custody when they were subpœnaed: Taylor v. Commonwealth, 274 Ky. 51, 118 S. W. (2d) 140.

Although we are of opinion that no waiver of any kind could result from testimony given in obedience to subpœna by persons in the position of parties accused, since it could not, under these circumstances, be voluntary, still, if, despite the formal charges against Bane, Powell, McBride, Phillips, Pansino, Miller, and Trew, the information against Phillips, and the indictment against Krasas, any of them could, by any possibility, have been considered as ordinary witnesses with only a limited privilege, even that was denied them, as is clear upon the merest reflection. The absolute privilege of an accused shields him from being called, sworn, or questioned at all, and therefore, if he should voluntarily take the stand and testify

upon any fact, it is right that he should be required to testify to all other facts relative to the charges against him, because he ought not to be permitted to volunteer only so much of the truth as will benefit him. The situation of the ordinary witness is different, since he is compelled to take the stand in the first instance and to answer to all facts within his knowledge except only those that may tend to incriminate him. His right to decline to answer does not arise until the incriminating fact is inquired about. From this distinction it results that the witness who elects to answer to fact "X" does not waive his privilege for fact "Y", unless the two are parts of a whole fact forming a single relevant topic, in which case the waiver as to a part is a waiver as to the remaining parts: Wigmore (3d ed.), sec. 2276. Many links frequently compose that chain of testimony that is necessary to convict a person of a crime, and if he discloses one or more he has not bound himself to disclose all. He may withhold other facts or circumstances which, in his judgment, might form another link in the chain of facts capable of being used to his detriment or peril: People ex rel. v. Forbes, etc., 143 N. Y. 219, 38 N. E. 303; Evans v. O'Connor, 174 Mass. 287, 75 Am. St. 316. The examinations of Bane, Powell, McBride, Phillips, Pansino, Miller, and Trew show that all were compelled to disclose incriminating facts and circumstances not disclosed even in part by their previous answers. The larger part of the examinations of Bane, Powell, and McBride, following their claims of privilege and following their indictment, extended to topics not previously inquired about. Solely because Phillips had said, "I never denied having a few slot machines around", it was held that he had voluntarily testified "that he was in the operation of slot machines", that he had entirely waived his privilege, and he was then forced to submit to unlimited questioning, even being required to state his income and to produce his income tax returns: Commonwealth v. Valeroso, supra; In re Bruno, 29 D. & C. 429 (Hicks, P. J.). Miller, because he was con-

fused by an ambiguous instruction that it would not incriminate him to reveal that he was in a "certain" business, was led to give incriminating evidence that he was engaged in conducting a numbers lottery. He also was instructed that he must produce his income tax returns, showing on their face the incriminating entry of his income from numbers. Incriminating evidence was elicited from Trew, not as to bribery or corrupt solicitation, but as to lottery violations and conspiracy, under a ruling of the court that it was compellable under article III, sec. 32, of the Constitution, relating to investigations against persons charged with bribery and corrupt solicitation; and in the face of a stipulation that his testimony should not be used against him, he was indicted by the grand jury that heard his disclosures. See Commonwealth v. Fuenstueck, 10 D. & C. 432 (Reno, P. J.), and Commonwealth v. Bell, 145 Pa. 374. When Pansino, Krasas, and Miller were taken before the court, they were instructed that they might, without incriminating themselves, answer fully as to events preceding the dates of the most recent lottery violations for which they had been convicted. This, too, was clearly erroneous, since each day's violation constituted a distinct offense: Commonwealth v. Bartilson et al., 85 Pa. 482; Commonwealth v. Chirico et al., 117 Pa. Superior Ct. 199; Commonwealth v. Stowell, 9 Metcalf 572 (Mass.); Wrenn v. State, 82 Tex. Crim. 642, 200 S. W. 844; and conviction for maintaining a lottery had not barred prosecution for conspiracy.

We conclude that, except as to Protin, who does not contend that he was compelled to give evidence against himself, and whose claim of prejudice rests entirely upon the manner of his examination before the grand jury, all the defendants were unlawfully denied the rights guaranteed them by section 9 of article I of the Constitution of Pennsylvania.

Finally, the prejudicial and illegal manner in which defendants were examined before the grand jury that

indicted them would be wholly incredible were there not a record transcribed from stenographic notes. We venture to think that nothing approaching it can be found in judicial annals since the Court of Star Chamber was abolished by the English Parliament following the Great Remonstrance of 1640. Abandoning all restraint, the Special Deputy Attorney General allowed himself openly to deride the testimony of defendants as insulting to his intelligence and to that of the grand jurors, to stigmatize the conduct of defendants as foul and venal, to denounce them as hypocrites and liars, and to declare his unshakable belief that they were as guilty as Hell. He prophesied for some the fate that was in store for them—the long years of imprisonment and separation from their families; he dwelt at length upon the disgrace and shame that their wrongdoing had brought upon their loved ones; he foretold the day when they would cross the dark river and enter into the eternal silences of God, despised and alone, their memories an abomination to their own children. He pictured the agony of Judas on that oriental night when he had betrayed the Master in the Garden of Gethsemane for 30 pieces of silver and went out and hanged himself. He commanded them to desist from blaspheming God by their perjury. Like a revival worker bending over impenitent sinners, he exhorted them with untiring zeal, and pleaded with them by all that was holy to do what they could to atone for their crimes while there was yet time; to confess their sins and receive the peace of repentance, that He who had died for them upon the cross might some day receive them unto Himself again. In the most dramatic manner and with great effect, from climax to climax he played upon the emotions and prejudices of the grand jurors and pressed upon them his deductions from the testimony. Every conceivable expression of reproach, as if for established mendacity, the prosecutor hurled at defendants by language, gesture, and tone of voice, until all doubts respecting the probity of any of

them had been dispelled from the minds of the grand jurors.

While it is the duty of the Commonwealth's counsel, as well as his privilege, to attend upon the grand jury with matters upon which they are to pass, to aid in the examination of witnesses, and to give such general instructions as they may require, any attempt on his part to influence their action or to give effect to the evidence adduced is grossly improper and impertinent: Commonwealth v. Bradney et al., 126 Pa. 199. Every man, whatever the offenses of which he may be suspected, is as much entitled to the just, impartial, and unbiased judgment of a grand jury as he is to that of a petit jury on his final trial. It is as essential that the one body as the other should be permitted to act free from sway or control from any source, and without fear or favor. The temptation to disregard these safeguards of the rights of persons accused is often great, though, happily, the instances are few where it has been yielded to; but this is one of them of a character so flagrant and shocking that no American court could tolerate it, and it is our duty to say so with emphasis: Commonwealth v. Smith, 185 Pa. 553.

The indictments will be quashed and dismissed, with leave to the Attorney General and his deputies to submit the charges to another grand jury, before which defendants shall not be summoned or their previous testimony be used against them.

## Order

And now, November 25, 1940, upon and after consideration, and for the reasons stated in the opinion filed this day, the motion ex parte defendant to quash the indictment in the above-entitled case is sustained, and the indictment is quashed and dismissed, with leave to the Attorney General and his special deputies to present a new bill based upon the present charges to the next grand jury, before which defendant shall not be summoned or his previous testimony be used against him.