[Crim. No. 21684. June 15, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID T. SAMUEL, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Janice L. Feinstein, Deputy Public Defender, for Defendant and Appellant.

Frank L. Williams, Jr., Public Defender (Orange), and William J. Kopeny, Deputy Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Jesus Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

Cecil Hicks, District Attorney (Orange), Michael R. Capizzi, Assistant District Attorney, and John D. Conley, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## Opinion

**MOSK, J.**—■ It is a fundamental canon of criminal law, and a foundation of due process, that "A person cannot be tried or adjudged to punishment while such person is mentally incompetent." (Pen. Code, § 1367; *Pate* v. *Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed.2d 815, 818, 86 S.Ct. 836]; *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 282 [61 Cal.Rptr. 644, 431 P.2d 228]; *People* v. *Pennington* (1967) 66 Cal.2d 508, 516-517 [58 Cal.Rptr. 374, 426 P.2d 942].) We have heretofore defined the threshold requirement of substantial evidence of mental incompetence that entitles a defendant to a hearing to determine such competence under Penal Code section 1368. (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 70-72 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Laudermilk, supra*; *People* v. *Pennington, supra.*)

Having easily crossed that threshold in this case, defendant asks us to determine whether the evidence actually presented at his section 1368 hearing is sufficient to support the ensuing jury verdict of competence. Because the record overwhelmingly demonstrates defendant's incompetence and is devoid of substantial evidence to the contrary, that verdict cannot stand and the judgment of conviction must be set aside.

### I.

Although we decide the appeal on the ground of sufficiency of the evidence, it is appropriate to comment briefly on the primary controversy over proceedings at the section 1368 hearing.

While defendant was in custody following his arrest, he was repeatedly questioned about the crime and ultimately confessed as a result of interrogation techniques seemingly violative of the *Miranda* rule as we adapted it to state constitutional principles in *People* v. *Pettingill* (1978) 21 Cal.3d 231, 244-246 [145 Cal.Rptr. 861, 578 P.2d 108]. The parties have vigorously debated whether the prosecutor's use of that confession at the section 1368 hearing violated defendant's privilege against self-incrimination. ■ But whether or not that privilege is normally operative at such hearings, on the facts of this case defendant could not complain of the use of the confession.

In preparing for the competence hearing, defense counsel furnished one of the expert psychiatric witnesses with a transcript of the confession. He then called that witness at the hearing to give his opinion of

defendant's competence. While the witness had the confession available to assist in forming his opinion of the defendant's competence, he testified he gave it little or no consideration. On cross-examination, the prosecutor read or paraphrased portions of the confession and asked the witness if they were consistent with the other reports of the crime he had received, and if so, why they did not alter his opinion.

This court held in *People v. Morse* (1969) 70 Cal.2d 711, 724-726 [76 Cal.Rptr. 391, 452 P.2d 607], that even at the trial itself, if the defendant puts his mental capacity in issue he cannot complain if his attorney hands over an illegally obtained confession to an expert witness who considers that confession in forming an opinion of the defendant's mental condition. Although the recent cases of *People v. Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272], and *People v. Rucker* (1980) 26 Cal.3d 368 [162 Cal.Rptr. 13, 605 P.2d 843], impliedly cast doubt on the vitality of the *Morse* rule in criminal trials, the principle applies here because of two distinguishing features of the section 1368 hearing.

First, a section 1368 hearing is held only after there has been a prima facie showing of mental incompetence. Of necessity, therefore, defendant's attorney must play a greater role in making fundamental choices for him, and cannot be expected to seek approval of strategic decisions made in the course of obtaining and presenting proof of incompetence. (*People v. Hill* (1967) 67 Cal.2d 105, 115, fn. 4 [60 Cal.Rptr. 234, 429 P.2d 586].) The privilege against self-incrimination is in certain other circumstances within the control of the accused: his voluntary and intelligent waiver of the privilege must be sought and obtained before a plea of guilt may be accepted (*Boykin v. Alabama* (1969) 395 U.S. 238, 243-244 [23 L.Ed.2d 274, 279-280, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122, 130-131 [81 Cal.Rptr. 577, 460 P.2d 449]), and he is ordinarily entitled to waive the privilege regardless of his attorney's wishes (*People v. Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710]). But in *Robles* we noted that the accused had been validly adjudged competent before asserting his right to testify over counsel's objection. (*Id.* at p. 215, fn. 1.) In so doing, we tacitly recognized the obvious: if counsel represents a defendant as to whose competence the judge has declared a doubt sufficient to require a section 1368 hearing, he should not be compelled to entrust key decisions about fundamental matters to his client's apparently defective judgment. In fact, in *People v. Merkouris* (1956) 46 Cal.2d 540, 555 [297 P.2d 999], we held that it was an abuse of discretion for the trial court to allow a defendant whose

competence was in question to withdraw a plea of not guilty by reason of insanity, thereby in effect pleading guilty, contrary to the advice of his attorney.

Furthermore, in *People* v. *Hill, supra*, we held that as a matter of tactics counsel may, without consulting defendant, waive defendant's statutory right to demand that a jury decide his competence (67 Cal.2d at pp. 114-115). Because serious doubt had arisen in this case regarding defendant's competence, counsel would have acted irresponsibly had he left to defendant the task of deciding which information the psychiatrists should review in preparation for the competence hearing.[1] If counsel makes use of a purportedly illegally obtained confession as the defense attorney did in this case, the prosecution must be allowed to use the incriminating statement at the hearing for the limited purpose of cross-examining the expert witness who obtained it as a possible aid in forming his opinion of defendant's incompetence.[2]

Second, the sole purpose of the section 1368 hearing is to determine defendant's competence, not his guilt. Hence, when the jury at the section 1368 hearing is properly instructed regarding the limited purpose of that hearing, and when that jury will not also decide the question of guilt at trial, the danger of prejudice in the determination of guilt discussed in *Disbrow* and *Rucker* does not arise.[3] We conclude that in this setting and under these circumstances the principle of *People* v. *Morse* still applies.

---

[1]The record does not reveal why defense counsel provided the court-appointed psychiatrist with the confession. Defendant suggests that if counsel's action constituted a waiver, as we hold it did, it also raises the spectre of denial of adequate assistance of counsel. Ordinarily, if a claim of ineffective assistance arises out of counsel's waiver of an allegedly incompetent defendant's fundamental right, we would scrutinize counsel's sacrifice of that right with heightened concern for the interests of the accused. We do not reach the contention in this case, however, because we reverse on other grounds and therefore need not decide whether the confession would have been inadmissible absent counsel's waiver. (See fn. 3, *post*.)

[2]Justice dictates that utilizing the statement for purposes of the section 1368 hearing does not waive defendant's self-incrimination privilege at trial. (See *Ex parte Sales* (1933) 134 Cal.App. 54 [24 P.2d 916]; 8 Wigmore on Evidence (McNaughten rev., 1961) § 2276, pp. 470-472, 36 A.L.R.2d 1403.)

[3]We decline the parties' invitation to decide whether, absent his attorney's waiver, defendant would have the right to exclude illegally obtained confessions from the section 1368 hearing. The right would apply if the hearing were considered a part of the criminal case or cause against defendant (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15) or if the purposes of the Fifth Amendment and the nature of the proceedings otherwise demanded its application (*In re Gault* (1966) 387 U.S. 1, 49-50 [18 L.Ed.2d 527, 558-559, 87 S.Ct. 1428]). Cases involving similar proceedings have produced dif-

## II.

On October 15, 1977, the defendant herein, 21-year-old David Samuel, was arrested and charged with the first degree murder of a gas station attendant during a robbery attempt. Before trial, it became evident to his attorney that Samuel was mentally ill, and he requested a hearing to determine his client's competence to stand trial. The judge granted the request, an action appropriate when the defendant has produced substantial evidence of incompetence or the judge harbors a doubt about defendant's competence. (Pen. Code, § 1368; *People v. Pennington, supra*, 66 Cal.2d at pp. 516-519.)

At the hearing, which occurred in August 1978,[4] the defense presented an impressive array of evidence demonstrating Samuel's present inability either to understand the nature of the proceedings against him or to rationally assist in the preparation and presentation of his defense. (See *People v. Laudermilk, supra*, 67 Cal.2d 272, 282, and cases cited.) In all, five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians

---

ferent results. (*Ibid.*) (juvenile hearings criminal in nature); *Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793] (commitment of mentally retarded persons civil in nature); *Conservatorship of Mitchell* (1981) 114 Cal.App.3d 606, 610-611 [170 Cal.Rptr. 759] (same); *Cramer v. Shay* (1979) 94 Cal.App.3d 242, 245 [156 Cal.Rptr. 303] (same); *Lessard v. Schmidt* (E.D.Wis. 1972) 349 F.Supp. 1078, 1101 (civil commitment results in deprivation of liberty as significant as prison term—*Miranda* applies); *People v. Moore* (1968) 69 Cal.2d 674, 682 [72 Cal.Rptr. 800, 446 P.2d 800] (commitment of narcotic addicts criminal in nature).) Our courts have characterized the section 1368 hearing differently depending on the right or duty in question. (Civil: *People v. Hill, supra*, 67 Cal.2d at p. 114 (right to jury); *People v. Loomis* (1938) 27 Cal.App.2d 236, 239 [80 P.2d 1012] (same). Criminal: *People v. Fields* (1965) 62 Cal.2d 538, 542-543 [42 Cal.Rptr. 833, 399 P.2d 369, 16 A.L.R.3d 708] (right to counsel on appeal); *Department of Mental Hygiene v. Hawley* (1963) 59 Cal.2d 247, 251-252 [28 Cal.Rptr. 718, 379 P.2d 22] (family need not reimburse state for expense of detention).) Because we rely primarily on the fact that counsel waived whatever objection defendant might otherwise have asserted against admission of the confession, we need not address this intricate and apparently tangled web of precedents relevant to the existence and extent of the privilege against self-incrimination in section 1368 hearings.

On this subject, see dictum in *Estelle v. Smith* (1981) — U.S. —, — [68 L.Ed.2d 359, 369-373, 101 S.Ct. 1866].

[4]A separate hearing was held four months earlier, resulting in a finding that Samuel was competent to stand trial. We draw no inferences from that fact, however, because we do not have the record of that hearing before us and because competence to stand trial at one time does not prove competence at a significantly later time. This is demonstrated by the fact that the judge decided a new competence hearing was appropriate despite the existing finding, and by the additional fact that less than a year prior to the hearing Samuel was found incompetent to stand trial in a different case.

testified on Samuel's behalf. In addition, four psychiatric reports were admitted into evidence. Without exception, each witness and every report concluded that throughout the period during which the declarant observed the defendant, the latter was incompetent to stand trial. In response, the prosecution offered no expert testimony whatever and only two lay witnesses, neither of whom contradicted any of the defense testimony.

■ Of course, the jury is not required to accept at face value a unanimity of expert opinion: "To hold otherwise would be in effect to substitute a trial by 'experts' for a trial by jury . . . ." (*People* v. *Wolff* (1964) 61 Cal.2d 795, 811 [40 Cal.Rptr. 271, 394 P.2d 959].) "The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion." (*People* v. *Bassett* (1968) 69 Cal.2d 122, 141 [70 Cal.Rptr. 193, 443 P.2d 777], quoting from *Carter* v. *United States* (D.C.Cir. 1957) 252 F.2d 608, 617.) ■ Nevertheless, the following review of the undisputed facts upon which the defense witnesses relied and the reasoning by which they arrived at their conclusions demonstrates the overwhelming strength of defendant's case.

When he was eight or nine years old, Samuel began to exhibit clear signs of mental disorder. He experienced catatonic episodes during which he lay motionless in his bed for days. He also began hearing disembodied voices, a common symptom of schizophrenia. There was apparently a genetic basis for his illness, as his sister also experienced hallucinations.

As he grew older, his psychological problems increased. He began to use drugs, apparently inflicting brain damage on himself by sniffing solvents and glue. He spent much of his time in jail or in mental institutions. In 1977 he was charged with robbery, adjudged incompetent to stand trial, and committed to Patton State Hospital. Upon his arrival at that institution in early June, he was extremely withdrawn and would not respond to questions. He was apparently experiencing auditory and visual hallucinations which constantly distracted him. He was obsessed with a conflict between God and the devil; he spoke distractedly about it, at one point blurting out "the devil will burn in his own fire." He was treated with large doses of thorazine, an antipsychotic drug that affects the brain stem area, which controls emotions, but not the cortex, where the thought processes occur. He continued to hallucinate: he believed he

was being accompanied or commanded by two supermen, and insisted that they had cut his finger. At one point, he fasted for several days because he believed that if he ate anything the spirits would "knife him." He also believed he had a bullet wound in his abdomen, although no such wound existed. He was observed on several occasions sitting by himself talking, laughing, and rolling his eyes. When asked why he was in the hospital, he responded, "The judge doesn't like me."

After several weeks of medication and continual supervision, he was able to participate in some recreational activities and to obey commands to perform simple tasks such as dressing and cleaning himself. His attention span remained short, however, and he continued to hear voices.

In July 1977, Samuel joined two other patients in escaping from Patton. They pried open a recreation room window and climbed over an 18-foot fence using a rope made of knotted sheets. According to psychiatric technicians the security at Patton was not rigorous, and mental patients frequently escaped.[5] Samuel was not apprehended until October 15 of that year, at the scene of the murder for which he has been convicted. From the time of his arrest to the time of the hearing, he was observed and examined by the eight psychiatrists and psychologists who testified at trial.

Upon arrival at the Orange County jail, he exhibited "overtly and in a sense grossly psychotic" behavior. He required repeated confinement in a "restraint room," a padded cell in which he was left unclothed for his own protection. Dr. Ingle, the chief psychiatrist at the jail, frequently observed him through a small window, and on doing so discovered that "he would be huddled in a corner, either jibbering or talking to the wall or to the light. He would not pay attention to anybody ... coming up to the window from the outside. He was soiling himself with feces and rolling in his feces, and would come out of the restraint room looking pretty bad. He at that time was eating feces. Pretty much typical extremely regressed behavior of a severely schizophrenic individual." Immediately recognizing the severity of Samuel's illness, Dr. Ingle treated him with a daily dose of thorazine 10 times that which he had received at Patton, and roughly 100 times the amount it would take to

---

[5] This point was repeatedly made not by the defense but by the prosecution, in a thinly disguised attempt to raise a fear in the jury that a finding of incompetence would only give defendant another opportunity to inflict himself on society.

completely incapacitate a normal person. According to every doctor who addressed the subject, Samuel's ability to tolerate the massive doses of medicine required to stabilize him clearly proved that he could not be feigning mental illness; as one doctor explained, "nobody can tolerate that level except the most disturbed and acute schizophrenics." By the time of the hearing, the dosage had been cut in half to avoid severe side effects, but was still far beyond the amount a normal person could tolerate.

According to Dr. Ingle, Samuel was resistant to the medication, and "remained delusional; fluctuating delusions ranging from being the archangel Michael to being Jehovah to being Christ. . . . He was hearing voices during that early phase all the time, continuously. The voices were telling him to kill others." He came to view the restraint room as a place of retreat, and would ask to be put into it "because the voices that were telling him to kill others were becoming very insistent and he was having a great deal of trouble with them." He would constantly experience "sympathetic arousal," during which he would perspire and his heart rate would increase dramatically.

Around March 1978, Samuel became less overtly psychotic. Although he continued to hear voices and showed no appreciable signs of mental improvement, he became physically docile and fell into a "rote pattern," following the same jail routine, day in and day out.

Admittedly, even this long history of aberrant behavior could be consistent with present competence to stand trial: "more is required to raise a doubt [about competence] than mere bizarre actions [citation] or bizarre statements [citation] or . . . psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense." (*People* v. *Laudermilk, supra*, 67 Cal.2d 272; 285.) As noted above, a person is incompetent to stand trial only if he is unable either to understand the nature and purpose of the proceedings against him or to rationally assist counsel in the conduct of the defense. But here the experts did focus specifically on how Samuel's mental infirmities affected his ability to understand the proceedings and to assist his attorney.

The consensus was that he suffered from three separate mental disorders: chronic schizophrenia, some degree of mental retardation, and some organic dysfunction. These combined to cause "extremely bizarre patterns of thought and speech." It was "very difficult for him to orga-

nize his thinking and make any meaningful statements." One psychologist reported that Samuel was apparently willing to cooperate but "if I asked him a question, it often took him up to a full minute to give me an answer." The doctor was therefore unable to complete any psychological testing. His conclusion, and the conclusion of several of the others based on their own observations, was that Samuel's "verbal blocking" would seriously impair his ability to assist counsel at trial.

In addition, Samuel's aural hallucinations continued to distract him, rendering him unable to attend to surrounding events and conditions. We have recognized that "If, while defendant was hearing voices ... a prosecution witness were testifying, defendant would be incapable of paying attention to the testimony and thus be unable to signal his attorney as to those portions of testimony which were inaccurate. Without such assistance from the client, a defense attorney's cross-examination is obviously defective." (*People* v. *Pennington, supra*, 66 Cal.2d 508, 516.)

Furthermore, Samuel's comprehension and general fund of information were extremely restricted. When asked to name all the presidents of the United States he could remember, he could give only two names —Martin Luther King and Richard Nixon. One psychologist was successful in administering the Weschler I.Q. test, but Samuel achieved a full-scale score of only 58—far below normal—and performed worst on the verbal and vocabulary subtests. His general ignorance and inability to reason obviously cast serious doubt on his ability to rationally cooperate with counsel during trial.

Perhaps most revealing are Samuel's responses to specific inquiries about the trial and his attorney. When asked by Dr. Ingle why he was in jail, "he could give ... only a very vague and confused idea of why he thought he was here. He couldn't follow a thought through to completion.... His thoughts would jump from one thing to the next, so that you couldn't exactly follow what he was trying to say."

Another psychiatrist testified, "In specifically trying to assess whether or not he could work with his attorney in his own defense, I would address questions as to the charges. And he was usually able to say that ... he was charged with murder. And then I would say, 'Well, what might be the result—what will happen to you now?' He had no concept of a trial. I said 'Well, what would happen, for example, to people who kill other people?' 'The police shoot them.' Consistently, I'd ask him

about his attorney and if he felt that his attorney was trying to help him. He had no idea. At times he was very suspicious of him. He didn't know what his attorney was trying to do. . . . He said that he felt at times that his attorney was against him, and his attorney made him say 'Yeah' all of the time, and he didn't really understand what was going on in court . . . ." At one point, he stated that he would "not aid in his defense at all because he will be found guilty and killed in court by the policemen in court." At other times, however, his delusions of immortality surfaced, and he expressed a desire "to test to see if he can be killed, because . . . he thinks there is something wrong with him, and he can't be killed." From all the above, each psychiatrist and psychologist understandably concluded that Samuel was in no condition to go to trial.

■ The experts' testimony in this case is entitled to great weight. It is true that in the past we have called into question the value of expert opinion on the issue of legal sanity (*People* v. *Drew* (1978) 22 Cal.3d 333, 350-351 [149 Cal.Rptr. 275, 583 P.2d 1318]; *People* v. *Wolff, supra*, 61 Cal.2d 795, 810-811) particularly with regard to the reliability of psychiatric predictions of future violence (*People* v. *Burnick* (1975) 14 Cal.3d 306, 325-326 [121 Cal.Rptr. 488, 535 P.2d 352]). Because the M'Naghten rule, applicable in California prior to *Drew*, was defined in terms not of mental capacity but of moral awareness, and because under that rule the experts were asked to speculate about the defendant's state of mind at the moment the crime was committed, we recognized that their opinions, even when unanimous, were not necessarily controlling.[6] Here, by contrast, the experts were called upon to address a question the answer to which normally turns on an analysis of the defendant's intelligence, ability to communicate, and emotional and mental stability—human characteristics of central concern to psychiatrists and psychologists. In addition, the experts were able to observe defendant over a long period of time, and to gauge his progress toward competency. They were not speculating about his state of mind at some time in the past; they were assessing his present mental abilities on the basis of thorough observation and examination continuing up to the

---

[6]"Defendant had to prove his lack of cognitive capacity at the moment of the assault. This condition, however, is not a matter which psychiatrists can detect by testing or interview; neither is such cognitive incapacity a characteristic symptom of defendant's illness. . . . [H]is ability to understand the difference between right and wrong . . . is not a relevant psychiatric fact. In sum, inadequacy of the expert evidence to prove insanity under the M'Naghten rule is essentially the result of the fact that M'Naghten requires proof of a subjective state which is largely unrelated to the reality of mental illness." (*People* v. *Drew, supra*, 22 Cal.3d at p. 351.)

very week of the hearing. Against that impressive body of evidence, the prosecution offered lay testimony that scarcely did more than indicate that defendant could walk, talk, and at times, recall and relate past events.

The prosecution witnesses revealed little if anything about Samuel's competence to stand trial. The first was a psychiatric technician at Patton who observed defendant and two other patients as they were climbing over the security fence to escape. He did not overhear any discussion among the three, did not know how or by whom the escape was planned, and did not even know which one was the defendant. The second witness was a sheriff's deputy at the Orange County jail who was, from midnight until 8 a.m., in charge of the housing area in which Samuel and 170 to 180 other inmates were being held. He described generally the procedure by which inmates are fed; this requires that they walk from their cells to the mess hall, eat, and return. He testified that, from his limited observation, he was unaware that Samuel had ever failed to cooperate in observing that routine. He also asserted that Samuel kept his cell neat, sometimes asked for medication, and on occasion volunteered to help clean the walkway area outside his cell.

Samuel's ability to perform routine manual tasks and obey simple commands, however, bears little relation to the question at issue. Although a defendant subject to uncontrollable public outbursts may be found unfit to stand trial (see, e.g., *People* v. *Pennington, supra*, 66 Cal.2d 508, 512-516), it does not follow that a defendant who is physically submissive is automatically competent. Evidence that a defendant can obediently walk into the courtroom and sit quietly during the trial does not constitute substantial proof of competence; indeed, it could describe one in a catatonic state.

The evidence that surfaced during the prosecutor's cross-examination of the defense witnesses was no more substantial than that adduced in his case-in-chief. For the most part, he undertook to attack the credibility of the psychiatrists and psychologists and attempted to establish that defendant was merely feigning mental illness to avoid trial.

In his impeachment efforts the prosecutor frequently referred to the "Rosenhan Study," an experiment conducted some years ago at Stanford University in which several sane persons complained of symptoms of mental illness and successfully gained admission to various mental institutions. (Rosenhan, *On Being Sane in Insane Places* (1973)

13 Santa Clara Law. 379.) Although, as we have previously noted, the study tended to cast doubt on then-current methods of psychiatric diagnosis (*People* v. *Burnick, supra,* 14 Cal.3d 306, 326, fn. 16), no reasonable factfinder could rely on it to reject the well-documented and uncontradicted psychiatric and psychological testimony in this case. Certainly our passing mention of the Rosenhan study in *Burnick* was not meant to put in question the use of expert witnesses at section 1368 hearings or any other proceeding in which their testimony is relevant and uncontradicted.

The prosecutor next attempted to elicit an admission from each of the expert witnesses that defendant could be malingering. In response, however, each one reaffirmed his belief that defendant could not possibly be faking, given his long history of mental illness, his tolerance of massive doses of psychotropic drugs, his extremely regressive behavior, his low intelligence, and his involuntary psysiological symptoms.

As mentioned at the outset, the prosecution was also allowed to read into the record or paraphrase portions of the confession defendant made to the police in October 1977. The confession is fairly coherent and is apparently accurate in the details it mentions. If it were presented to the jury in isolation from the remainder of the evidence, it would tend to prove Samuel's competence. But in passing on its substantiality, we must look to the record as a whole. (*People* v. *Bassett, supra,* 69 Cal.2d 122, 138.) Although an item of evidence considered without regard to the rest of the record may appear probative, its value may be undercut by undisputed facts compelling a contrary conclusion. (*People* v. *Holt* (1944) 25 Cal.2d 59, 69 [153 P.2d 21].) We are of the view that the following facts render the confession insubstantial evidence of Samuel's competence at the time of trial.

First, it was obtained almost a year before the hearing, and apparently before the onset of the extreme psychotic episodes in the Orange County jail. Because the issue at the hearing is present competence, an untimely confession is not highly probative. Second, all the expert witnesses agreed that even an acute schizophrenic such as Samuel is capable of emerging from his psychotic state for limited periods, and then without warning falling back into it.[7] Yet throughout the extensive ob-

---

[7] As Dr. Rosenstein, one of the psychologists, explained: "You could have the most acutely ill schizophrenic, who would believe that he were Napoleon Bonaparte and talking to Jesus in a corner for 12 hours. It's reasonable to assume that for the other 12 hours the patient might appear to be normal."

servations—one doctor alone observed defendant 65 times in that period—and examinations conducted by the psychiatrists and psychologists between the time of the confession and the time of the hearing, Samuel never became lucid and coherent again. A single episode of relative coherence in more than a year of fairly constant observation raises at most a suspicion, but more likely a grave doubt, that defendant might be able to emerge from his schizophrenic state long enough to rationally participate throughout his trial. As we have said many times before, "Suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

■ Our power to weigh the evidence is of course limited by due deference to the trier of fact, and we must therefore view the record in the light most favorable to the verdict. (*People* v. *Simpson* (1954) 43 Cal.2d 553, 571 [275 P.2d 31]; see also *Meiner* v. *Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140-141 [94 Cal.Rptr. 702].) "But the jury's discretion is not absolute," particularly in this context. (*People* v. *Bassett, supra*, 69 Cal.2d 122, 137.) The verdict must be supported by *substantial* evidence—that is, evidence "'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case'" (*Id.* at p. 139, quoting from *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; accord, *People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468].) ■ And although we must always take care to avoid encroaching on the proper province of the jury, in this case there are three reasons why we are less hesitant than usual to subject the verdict to close scrutiny.

First, the right to a jury in section 1368 hearings is a creature of statute, rather than a mandate of our Constitution as is the jury right at trial. (*People* v. *Hill, supra*, 67 Cal.2d 105, 114.) Thus there is no constitutional right, either of the People or of defendant, involved.

Second, on the particular facts of this case the demeanor of the witnesses could not have been more than an insignificant factor in resolving the question of competence. Defendant did not testify, and almost all those who did were either court-appointed medical experts or employees of the public institutions in which defendant was confined. Such witnesses could not reasonably be suspected of falsification or bias. Furthermore, there was no real conflict in the testimony: the jurors did not have before them the question, "whose version of the facts

should we believe?" but only the query, "what should we conclude from the facts on which everyone agrees?"

Third, in reversing a finding of competence, we do not necessarily affect the question of guilt or the penalty to be imposed. We merely assure that the accused will not be put to trial until he is able to understand his predicament and rationally assist his attorney in presenting his defense.

■ On this record, we conclude that the jury could not reasonably reject the persuasive and virtually uncontradicted defense evidence proving Samuel's mental incompetence to stand trial. The verdict therefore must be set aside. Our duty to protect the integrity of the judicial process requires us to prevent the mockery of justice that results from the prosecution, conviction, and punishment of a person so afflicted.

After the section 1368 hearing, defendant was brought to trial, convicted of first degree murder, and sentenced to life imprisonment without possibility of parole. Because the verdict of competence was unsupported by substantial evidence, however, the effect was the same as if defendant had been denied his constitutional right to a proper hearing on the competence issue. (See *Pate v. Robinson, supra,* 383 U.S. 375, 385 [15 L.Ed.2d 815, 822].) The error is prejudicial per se, and requires that we reverse the judgment of conviction. (*People v. Pennington, supra,* 66 Cal.2d 508, 521.)

The judgment is reversed.

Tobriner, J., Newman, J., and Blease, J.,* concurred.

Richardson, J., concurred in the result.

**BIRD, C. J.,** Concurring and Dissenting.—I concur in the result and in part II of the majority opinion which holds the evidence in this case to be insufficient to sustain the finding of competency. However, I dissent from the majority's continued, albeit limited, reliance upon *People v. Morse* (1969) 70 Cal.2d 711 [76 Cal.Rptr. 391, 452 P.2d 607]. *People v. Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272] and *People v. Rucker* (1980) 26 Cal.3d 368 [162 Cal.Rptr. 13, 605 P.2d 843], have, in my view, overruled *Morse* sub silentio. "The salient

---

*Assigned by the Chairperson of the Judicial Council.

point is that in this state, the exclusionary rules relating to *Miranda* and to the privilege [against self-incrimination] apply regardless of the purpose for which the response is sought to be admitted or the timing of its admission. [Citations.]" (*People v. Rucker, supra*, at p. 391.)

Additionally, the majority's refusal to decide the issue of whether illegally obtained confessions are admissible at a competency hearing leaves counsel in a Catch-22 situation. If counsel withholds such statements from an expert whose opinion is sought concerning the present competency of his client, the expert witness' opinion is subject to possibly devastating impeachment if the prosecutor can introduce the client's statements at the competency trial. If counsel provides such material to the expert, under this court's decision, he has waived his right to object to the introduction of the evidence as elicited on the cross-examination of the expert. Following either course will probably subject counsel to the claim that he has rendered ineffective assistance of counsel. (See maj. opn., *ante*, at p. 496, fn. 1.)

Since I do not agree that the *Morse* exception to the *Miranda* exclusionary rule has survived this court's later cases and since failure to address the admissibility issue creates further uncertainty and confusion, I would resolve the question concerning the admissibility at a Penal Code section 1368 hearing of the illegally obtained statements. The reasoning found in *People v. Moore* (1968) 69 Cal.2d 674 [72 Cal.Rptr. 800, 446 P.2d 800] is both applicable and persuasive. In *Moore*, a unanimous court decided that the exclusionary rule as it relates to illegal searches and seizures was applicable to narcotic addiction commitment proceedings, despite the fact that guilt was not in issue and the proceedings were labeled "civil" rather than "criminal."

In *Moore*, the court reasoned that "the [narcotics addiction commitment] proceeding has some of the features pertinent to a criminal case" (69 Cal.2d at p. 681), citing, inter alia, the fact that the state is the defendant's opponent, that the defendant is entitled to be represented by counsel at all stages of the proceedings, including appointed counsel if the defendant is indigent, and that liberty is at stake. Why don't these same considerations apply to a section 1368 competency hearing? (See Pen. Code, §§ 1368, 1369, 1370.)

A competency hearing is even more closely related to a criminal trial since a finding of competency, in cases where defendant's competency is in doubt, is a statutory and constitutional prerequisite to a determina-

tion of criminal guilt. (Pen. Code, § 1367; *Pate* v. *Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed.2d 815, 818, 86 S.Ct. 836]; *People* v. *Pennington* (1967) 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942].) *Moore* teaches that where "it is apparent that there is a close identity to the aims and objectives of criminal law enforcement ... to hold unconstitutionally obtained evidence admissible in the proceedings would furnish an incentive to violate [the Constitution]." (69 Cal.2d at p. 682.) (While there is dictum in the recent case of *Estelle* v. *Smith* (1981) — U.S. —, — [68 L.Ed.2d 359, 368-371, 101 S.Ct. 1866] which implies that there may be no Fifth Amendment self-incrimination protection at a competency hearing, this court's prior decisions indicate a different result under the state constitutional guarantee against self-incrimination (Cal. Const., art I, § 15).)

For these reasons, I would hold illegally obtained statements inadmissible at a section 1368 hearing.

Rattigan, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.